## Richmond

ROGER A. LESOINE V. COMMONWEALTH OF VIRGINIA.

December 6, 1968.

Record No. 6839.

Present, All the Justices.

*Norman Olitsky* (*Vann H. Lefcoe*, on brief), for plaintiff in error.

*M. Harris Parker, Assistant Attorney General* (*Robert Y. Button, Attorney General*, on brief), for defendant in error.

SNEAD, J., delivered the opinion of the court.

Roger A. Lesoine, defendant, who was represented by retained counsel, pleaded not guilty to an indictment charging him with the attempted murder of Edward Leon Woodley. The jury returned a verdict of guilty as charged in the indictment and fixed his punishment at confinement in the State penitentiary for a period of five

years. On June 15, 1967, the court rendered judgment in accordance with the verdict. Upon petition of defendant, we granted a writ of error and supersedeas to that judgment.

The defendant makes numerous assignments of error. However, we think the controlling issues presented, as stressed by counsel for defendant in his oral argument, are (1) whether the trial court erred in admitting testimony that Woodley, the victim, identified defendant from one of "6 or 8" photographs of different persons shown to him by police officers while he was in the hospital, and (2) whether the trial court erred in admitting testimony that defendant was identified by Woodley at a confrontation at the hospital without defendant's counsel being present.

The record shows that Mrs. Ruth C. Vinson, white, who resided at 3801 Duke street in Portsmouth, employed Mrs. Laura Smith, a Negro, on Saturday, January 21, 1967 to baby-sit for the day. Edward Woodley, a Negro, who resided at 524 Nelson street, arrived at Mrs. Vinson's home during the evening. He did not drive his pickup truck that night because it was not in running condition. After he and Mrs. Smith had watched television for about an hour, Mrs. Vinson loaned Woodley her automobile to transport Mrs. Smith to her home located at 1620 London street. They left the Vinson home at approximately 11 p.m. When Woodley entered the car he placed under the front seat his .32 calibre revolver which he had taken from his pickup truck because he was afraid the pistol would be stolen. As Woodley backed the car out of the driveway, he observed that a red Mustang and a "Fairlane Ford with red bottom and light top" were parked near the house. The two cars followed closely behind him as he proceeded toward Mrs. Smith's home.

Woodley stated that he "went on going about my business without paying them no mind". As Woodley turned right at an intersection the Mustang turned left, but the Ford Fairlane continued to follow him until he reached Mrs. Smith's residence at about 11:20 p.m. Woodley remained parked at the curb in front of Mrs. Smith's home until she was safely inside the house. As he prepared to pull away, the Ford Fairlane, with "all the tires sliding", blocked him at the curb. Immediately thereafter four white men jumped from the car and two of them "snatched" open the left door of Woodley's vehicle before he could lock it and without saying anything started firing pistols at him. Woodley managed to close the door but his assailants continued to shoot through it. He retrieved his revolver from under the front

seat and returned shots at his assailants. Woodley testified that one of the attackers, later identified as Lesoine, was close enough for him to "put his hands on me".

John Gingras, who was with companions on a nearby corner at a gas station, testified that he saw what he "thought was firecrackers" and three people jump into a car and depart from the scene; that when he arrived there he noticed that windows had been "shot out or knocked out" of Woodley's car, and that Woodley was lying in the bloodstained front seat calling for help, stating that he had been shot. Gingras notified the police who arrived in a few moments.

Woodley was rushed to the Portsmouth General Hospital and treated for his severe wounds. He was struck eleven or twelve times. Five of the bullets remained in his body and four in his head. Shortly after his admission to the hospital Woodley informed the police that one of his attackers was a large person and described the way he combed his sandy hair. He also stated that he could recognize him by his face lines.

On January 23, 1967, the following Monday, police officers returned to the hospital with "6 or 8" photographs of different persons taken from police files and exhibited them to Woodley "one at a time". According to Robert E. Joyner, captain of detectives, when the photograph of Lesoine, the defendant, was shown Woodley "he reached right up and took it out of my hand and said, 'This is the one right here' ". After this identification, Lesoine was apprehended on the same day, brought to headquarters, fully advised of his constitutional rights, questioned, and charged with attempted murder. While there Lesoine employed counsel by telephone to represent him. The police were aware of this fact but later that evening, without notice to counsel, Lesoine was taken to the hospital where he walked past Woodley's bed in a ward. No words were spoken and Woodley identified Lesoine as one of his assailants. During the trial Woodley pointed to Lesoine as one of the persons who shot at him.

Lesoine testified that he was 20 years old, weighed 315 pounds and was 6 feet 5 inches tall. He denied that he was in Portsmouth at the time of the shooting or that he owned a revolver. He gave a rather detailed account of his activities from the early evening of January 21, 1967 until 2 a.m. the next day.

■ The defendant contends that the trial court erred in admitting testimony that photographs were shown to Woodley by police officers while he was in the hospital and that he identified defendant from one

of them. The testimony was objected to as being hearsay. However, defendant does not argue that point here. The entire argument contained in his brief to support his position follows:

"* * * [T]hese photographs were shown to the complaining witness only a short time after his ordeal, at a time when his mind was receptive to suggestion. Furthermore, only a handful of photographs were (sic) shown to the complaining witness, which strongly indicates that the police were trying to suggest that the photographs shown were those of persons whom the police would naturally suspect of such a crime, although they had no real evidence to lead them to suspect the defendant in this case."

The record shows that the police exhibited "6 or 8" photographs of different persons taken from police files to Woodley two days after he had been admitted to the hospital, and that he identified Lesoine from one of them without hesitation and without any suggestion from the officers. Woodley had given police officers a partial description of one of his assailants on the night he was hospitalized. It would be highly speculative to say under the evidence adduced that Woodley's mind due to the short lapse of time after "his ordeal" was receptive to suggestion when the photographs were exhibited to him. It is just as probable that, as asserted by the Commonwealth, "the early showing helped Woodley to better identify him before his memory had become dimmed by time". The number of photographs shown was sufficient to negate any suggestion that Lesoine was one of his assailants. We hold that this assignment of error is without merit.

■ The defendant also contends that because his counsel was not present at the confrontation, the trial court erred in admitting evidence that he was taken to the hospital and identified by Woodley. Lesoine points out that the police were aware of the fact that he had retained counsel prior to the confrontation at the hospital, yet they made no effort to notify his attorney that he (Lesoine) would be taken there for identification purposes. Lesoine argues that this action by the police deprived him of his constitutional right to effectively cross-examine the prosecuting witness as contemplated by the Sixth Amendment to the Constitution of the United States. In support of his contention, Lesoine relies upon *United States* v. *Wade*, 388 U.S. 218, 87A S.Ct. 1926, 18 L.Ed. 2d 1149. (Decided June 12, 1967). That case was argued orally along with *Gilbert* v. *State of California*, 388 U.S.

263, 87A S.Ct. 1951, 18 L.Ed.2d 1178, and *Stovall* v. *Denno*, 388 U.S. 293, 87A S.Ct. 1967, 18 L.Ed.2d 1199, which presented similar questions.

In *United States* v. *Wade, supra,* the court held, among other things, that the post-indictment line-up was a critical stage of the prosecution; that Wade was entitled to the assistance of counsel then as much as at the trial itself under the Sixth Amendment to the Constitution of the United States; that Wade and his attorney should have been notified of the impending line-up, and that in the absence of an intelligent waiver, counsel's presence should have been required before conducting the line-up.

The requirement of the presence of counsel at the time of confrontation for identification is not applicable in the case at bar. In *Stovall* v. *Denno, supra,* the court specifically stated:

"* * * We hold that *Wade* and *Gilbert* affect only those cases and all future cases which involve confrontations for identification purposes conducted in the absence of counsel after this date [June 12, 1967]." The confrontation of which Lesoine complains occurred on an earlier date, January 23, 1967. Hence the rule enunciated in *Wade* and *Gilbert* is not controlling.

We hold that Lesoine's constitutional rights were not violated by the absence of his attorney at the time of confrontation.

We next are confronted with the question of whether or not Lesoine was denied due process of law under the Fourteenth Amendment. In *Stovall* v. *Denno, supra,* the defendant was arrested in connection with a murder and a stabbing. He was taken, while handcuffed to one of the police officers, to the hospital where one of the victims was being treated. The defendant was the only Negro in the room and no other suspect was present. From her bed she identified Stovall as one of her assailants. The Supreme Court in holding that Stovall had suffered no denial of due process under the circumstances, stated:

"'* * * Faced with the responsibility of identifying the attacker, with the need for immediate action and with the knowledge that Mrs. Behrendt could not visit the jail, the police followed the only feasible procedure and took Stovall to the hospital room. Under these circumstances, the usual police station line-up, which Stovall now argues he should have had, was out of the question.'" We can find no basis for a distinction between the *Stovall* case and the case at bar on this point. We conclude therefore that Lesoine was not deprived of due process of law in violation of his constitutional rights, and that the

trial court did not err in admitting evidence that he was identified by Woodley at the hospital.

We have carefully considered the remaining assignments of error and find no prejudicial error in any of them.

The judgment appealed from is

*Affirmed.*