**Salem**

RONALD HILL, a/k/a

Ronald Edwin Hill

v.

COMMONWEALTH OF VIRGINIA

No. 0024-85

Decided August 19, 1986

COUNSEL

J. Harold Eads; Malfourd W. Trumbo (Carter, Roe, Emick & Moore, P.C., on brief), for appellant.

W. Mark Dunn, Assistant Attorney General (William G. Broaddus, Attorney General, on brief), for appellee.

OPINION

KOONTZ, C.J.—Appellant, Ronald Hill, was convicted by a Botetourt County Circuit Court jury of robbery in violation of Code § 18.2-58, entry of a banking house with the intent to commit larceny while armed with a deadly weapon in violation of

Code § 18.2-93, and the use or display of a firearm in the commission of robbery in violation of Code § 18.2-53.1. On appeal, he raises the following issues:

I. Whether the trial court erred in not sustaining Hill's motion to suppress the testimony of the four eyewitnesses (three savings and loan employees and Leonard Eugene Tucker) because:

 A. Hill's constitutional right to counsel at a lineup was violated;

 B. The eyewitnesses' identifications of Hill were tainted by improper use of photographs and lineup procedures;

 C. Tucker's view of Hill at his workplace was tainted by improper procedures;

 D. The alleged contradiction in the testimony of the witnesses showed that views of Hill produced tainted evidence.

II. Whether the trial court erred in not striking the Commonwealth's evidence on the charges of robbery and entry of a banking house with the intent to commit larceny while armed with a deadly weapon in that the elements of the two charges are the same and the charges should be merged.

III. Whether the evidence was sufficient as a matter of law to convict Hill on all three charges.

We find no reversible error. Accordingly, we affirm the three convictions.

The Daleville Branch of First Federal Savings and Loan in Botetourt County was robbed by an armed gunman on May 1, 1984, at approximately 5:15 p.m. Branch Manager Diane Hundley, along with tellers Donna Guill and Christine Ulrich, were in the branch at that time. The gunman, an unmasked black male wearing a jogging suit, entered the savings and loan and pointed a handgun at Guill. He ordered the two tellers to lie face down on the floor, then forced Hundley to empty the cash drawers at gun point. Hundley was then told to lie face down on the floor. The

gunman removed a plastic bag from a trash can before leaving the building with over $11,000.

Leonard Eugene Tucker was mowing grass at the Sovran Bank located between First Federal Savings and Loan and Botetourt High School on May 1, 1984, at approximately 5:00 p.m. He saw a black man get out of a car parked in the high school lot. The man, who was wearing a blue jogging suit, walked toward First Federal. At first Tucker thought the man was an acquaintance; however, once the man got closer, Tucker realized his mistake. Shortly thereafter, Tucker saw the same man jog past him in the direction away from First Federal, and toward the high school parking lot.

That evening, an investigator for the Botetourt County Sheriff's Department spotted a red Chevrolet Nova with primer spots parked on a street in the city of Roanoke. It matched the description he had of the vehicle which was involved in the robbery. While the investigator was inspecting the unoccupied automobile, Hill approached and asked if he could be of assistance. After repeated inquiries, Hill identified himself and stated that the car belonged to Stacy Layne. Hill repeatedly asked the investigator why he was interested in the vehicle. He then left the scene in another automobile, occupied by others.

Stacy Layne testified for the Commonwealth at trial. At the time of the robbery Layne and Hill were dating. When she testified at trial in the instant case, Layne had been convicted for her involvement in the First Federal robbery but had not yet been sentenced. Layne gave the following account of the events surrounding the robbery. She and Hill drove by the Daleville First Federal Branch in her red Nova on the afternoon of May 1. Hill asked Layne, who had an account at the Daleville First Federal, how many employees worked in the branch and whether there was a glass partition separating the customers from the tellers. Hill instructed Layne to pull into the Botetourt High School parking lot. Once parked, Hill left the car, went into First Federal, and came out minutes later carrying a plastic yellow trash bag. Later, Layne saw that this bag contained a considerable amount of cash and Hill told her to forget what she had seen. Later that night, Hill phoned her to say that he had left her red Nova parked on a Roanoke street.

At trial, Hill testified on his own behalf. He stated that he saw Layne on May 1, but denied any involvement in the robbery. He admitted that he took Layne's car to Roanoke that evening where he saw the investigator. He then went to Greensboro, North Carolina, for a day, before taking a bus to New York City, where he left $6,000 with his sister. He stated that he accumulated this money in the "night life" by doing "favors."

Botetourt Deputy Sheriff Jerry Caldwell was involved in the investigation of the robbery. He showed photographs of black males to the three savings and loan employees and Tucker. One photograph was of Hill, which contained the notation "Edwin 112355, State Penitentiary, Richmond, Virginia."

Subsequently, Tucker was asked if he thought he could identify the man he saw on May 1. Tucker, along with Deputy Caldwell, the Sheriff, and another deputy went to Catawba Hospital - Hill's workplace. Tucker and the others were to act as if they were construction workers. They proceeded to the cafeteria, where Tucker identified Hill as the man he had seen on May 1. One other black male besides Hill was in the cafeteria. Tucker testified that he identified Hill immediately, but wanted to get a better look to make certain. He also stated that he "liked playing into the thing, too, I wanted the experience to last a little while."

Arrest warrants were issued on May 14 charging Hill with violating Code §§ 18.2-53.1 and 18.2-93 and he was arrested on that day. On May 16, at 1:16 p.m., he was taken to court where counsel was appointed for the two charges. At 5:28 p.m. that same day, an additional arrest warrant was issued charging Hill with violating Code § 18.2-58. (Counsel was not appointed on this charge until May 18.) Still later on the evening of May 16, at 6:48 p.m., Hill was placed in a lineup with five other black males ranging in height from 5'8" to 6'2". Hill's height is approximately 5'10". Hill did not waive any right to counsel he may have had at the lineup. Counsel was not present at the lineup, nor had he been informed that it was to take place. The three First Federal employees viewed the lineup, and each identified Hill as the robber. Hill did not meet with his attorney until the morning of May 17.

A preliminary hearing was held on June 8. The grand jury handed down indictments on October 1. The arraignment took place on October 29. The suppression hearing concerning the pre-

trial identification procedure occurred on November 20. The trial took place on November 27.

## I.

A. *Right to Counsel at the Lineup*

Hill contends that his sixth amendment right to counsel was violated when he was not given the opportunity to have his court-appointed lawyer present at the May 16 lineup. We need not address this issue because we find that the eyewitnesses' in-court identifications had a source independent of the lineup. Thus, even if it was error for the trial court to admit evidence of the lineup identifications, that error was harmless beyond a reasonable doubt.

The United States Supreme Court in *United States* v. *Wade*, 388 U.S. 218 (1967), established the test to be followed to determine if a denial of the right to counsel at a lineup precludes a witness who has participated in such a lineup from thereafter making a valid and admissible identification of the accused. The Court stated:

> [T]he proper test to be applied in these situations is that quoted in *Wong Sun* v. *United States*, 371 U.S. 471, 488, " '[W]hether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, *Evidence of Guilt* 221 (1959)." *See also Hoffa* v. *United States*, 385 U.S. 293. Application of this test in the present context requires consideration of various factors; for example, the prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any pre-lineup description and the defendant's actual description, any identification prior to lineup of another person, the identification by picture of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification. It is also relevant to consider those facts which, despite the absence of counsel, are disclosed concerning the conduct of the lineup.

*Wade*, 388 U.S. at 241 (footnote omitted).

The *Wade* Court concluded that there was insufficient evidence in the record to determine whether the in-court identifications had a source independent of the illegally conducted lineup. *Id.* at 242. *See also Gilbert* v. *California*, 388 U.S. 263, 272 (1967).

In the instant case, however, we conclude that ample evidence is contained in the record to indicate that the in-court identifications of Hill made by the three savings and loan employees had an origin independent of the lineup; thus, such identifications were not tainted by the lineup even if it had been conducted in violation of Hill's sixth amendment right.

At the trial, Donna Guill identified Hill as the person who robbed the savings and loan. She testified that, while he was in the savings and loan, she observed the robber for three to five minutes. She further testified that at that time she looked him full in the face. She also testified that the robber wore a royal blue sweat jacket with a white zipper. Finally, she testified that, prior to the lineup, she identified Hill in a photographic spread.

Christine Ulrich likewise identified Hill at trial. She also stated that she looked at the robber's face while he was in the savings and loan, and was within four feet of him during the robbery. Furthermore, she testified that the robber wore a jogging jacket, and that she had previously picked Hill out of a photographic spread.

Diane Hundley positively identified Hill as the robber at the lineup, the suppression hearing and trial. She noted that the robber had grabbed her arm and was standing next to her during the robbery, and that she got a good look at him. At the suppression hearing Hundley stated that, prior to viewing the lineup, she had picked out several photographs of individuals who resembled the robber, but could not state positively that any one was in fact the robber.

Applying this identification testimony to the test established in *Wade*, we conclude that the in-court identifications of the three witnesses had origins independent of the May 16 lineup. Each of the three witnesses had an extended and excellent opportunity to observe the individual who robbed the savings and loan, there was no apparent discrepancy between the pre-lineup descriptions given

by the witnesses and Hill's actual description, and none of the witnesses made a *positive* identification of another person prior to the lineup (although Hundley stated at the suppression hearing that several photographs of persons other than Hill "resembled" the robber). Guill's and Ulrich's identifications of Hill remained consistent throughout the photographic, lineup and trial procedures; and Hundley positively identified Hill as the robber at every face to face confrontation. Furthermore, the lapse of a mere two weeks between the robbery and the lineup suggests that the event was fresh in the witnesses' minds. Finally, as will be discussed more fully *infra*, there was no apparent suggestive taint to the lineup itself. Taken as a whole, the evidence clearly supports the conclusion that the three savings and loan employees identified Hill on the basis of their memories of the robbery, and not as a result of the lineup.

There is ample precedent to support our conclusion that this case need not be remanded to the trial court for a determination whether the in-court identifications had an independent origin. *See, e.g., Nero* v. *Commonwealth*, 213 Va. 154, 191 S.E.2d 226 (1972); *Stanley* v. *Commonwealth*, 210 Va. 490, 171 S.E.2d 846 (1970).

## B. *Photograph and Lineup Procedures*

Hill contends that the eyewitnesses' in-court identifications of him were tainted by the improper use of photographs and lineup procedures. In order to fully explore this issue, we must review the photo spread and lineup procedures for hints of suggestiveness and for reliability.

The United States Supreme Court has established guidelines to conduct such a review. Although the cases from that Court deal with a number of identification procedures, the due process considerations, and the analysis to govern those considerations, are applicable to the instant situations. In *Stovall* v. *Denno*, 388 U.S. 293 (1967), an assailant entered the home of Dr. and Mrs. Paul Behrendt, fatally stabbing Dr. Behrendt, and seriously injuring his wife. The police apprehended Stovall, and took him to Mrs. Behrendt's hospital room where she identified him as the assailant. The Court stated: "[T]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a

lineup, has been widely condemned. However, a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it." *Id.* at 302. The Court concluded that due to the serious nature of Mrs. Behrendt's injuries, it was imperative that a witness-suspect confrontation take place as soon as possible. Thus, under the totality of the circumstances, the identification procedure was not unduly suggestive.

In later years, the Supreme Court elaborated on the totality of the circumstances analysis, establishing factors to be considered to determine if the identification procedure was impermissibly suggestive. In *Simmons* v. *United States*, 390 U.S. 377 (1968), the Court stated:

[W]e hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irrefutable misidentification.

*Id.* at 384.

In *Neil* v. *Biggers*, 409 U.S. 188 (1972), the Court concluded that a police station showup was unnecessarily suggestive but yet so reliable that evidence of the showup identification was admissible. The Court listed several "factors to be considered in evaluating the likelihood of misidentification." *Id.* at 199. These include:

[T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id.* at 199-200.

These factors were echoed by the Court in *Manson* v. *Brathwaite*, 432 U.S. 98 (1977). In addition, the *Brathwaite* Court stated that the factors must be balanced against "the cor-

rupting effect of the suggestive identification itself." *Id.* at 114.

 From these cases two rules of law can be discerned. The first involves the admissibility of evidence of out-of-court identifications. Such evidence will be admitted if either (a) the identification was not unduly suggestive, or (b) the procedure was unduly suggestive, but the identification is nevertheless so reliable, in accordance with the factors noted in *Biggers* and *Brathwaite*, that there is no substantial likelihood of misidentification. Second, even if evidence of the out-of-court identification cannot be admitted, an in-court identification may still be made if the origin of that identification is independent of the inadmissible out-of-court identification procedure. Armed with these guidelines, we now turn to an evaluation of the facts surrounding the instant case.

1. *Photographs.*

Hill suggests that the photographic presentations to Guill, Ulrich and Tucker were unduly suggestive and unreliable.[1] Hill bases this assertion on three grounds: (1) that Hill's photograph was a mug shot containing the notation "Edwin 112355, State Penitentiary, Richmond, Virginia," (2) that Hundley's tentative photographic identification of another individual implied definite flaws in the photographic identification procedure, and (3) that there was an alleged conflict as to whether black and white and color photographs were mixed in the photo spreads, the implication being that Hill's photograph was highlighted.

Much testimony concerning the details of the photographic identifications was given at the suppression hearing. There, the three savings and loan employees, Tucker, and Deputy Sheriff Jerry Caldwell testified concerning the photographic identifications. Caldwell was in charge of showing the photographs to the eyewitnesses. He and the others testified that each eyewitness was shown more than one set of photographs, and that these sets were viewed at different times. Caldwell stated that some color and some black and white photographs were shown, but that a single set consisted entirely of one or the other. Hill's photograph was contained in a set of six black and white photographs. Four of these photographs were mug shots, and three of those (including

---

[1] The record indicates that Hundley apparently did not identify Hill from the photographs.

Hill's) had prison or jail information on them.

Tucker testified at the suppression hearing that he picked Hill's photograph from a spread of six black and white photographs. He also stated that he was shown one other photo spread in which he identified no one. He could not remember if this spread was made up of color or black and white photographs.

Guill and Ulrich testified that they each picked out Hill's photograph from the black and white spread that was introduced at the suppression hearing. They stated that they were shown several photo spreads at work, and Ulrich noted that the employees did not view the spreads together, but rather each employee viewed each spread separately.

Hundley testified that she was shown numerous photographs by local authorities and members of the Federal Bureau of Investigation. In all, the record indicates that she picked out three photographs of individuals other than Hill whom she claimed resembled the robber. One of these photographs was included in the set of six photographs that contained the actual picture of Hill. In court she maintained that the man in the photograph that she had chosen looked like the robber and also looked like Hill.

We note at this point that Hill makes no claim that he was entitled to the presence of counsel at the photographic displays. It is well settled that the right to counsel does not attach to such a procedure. *United States* v. *Ash*, 413 U.S. 300, 321 (1973); *see also Drewery* v. *Commonwealth*, 213 Va. 186, 189, 191 S.E.2d 178, 180 (1972). We also note that the photo spread which included Hill's picture was not shown to the jury but only introduced at the suppression hearing. Therefore, we are not presented with the question recently decided by another panel of this court in reference to the error surrounding the admission of an unmasked mug shot. *See Johnson* v. *Commonwealth*, 2 Va. App. 447, 345 S.E.2d 303 (1986).

The United States and Virginia Supreme Courts have addressed the question of the suggestiveness of photographic displays. In *Simmons*, two men entered a savings and loan, pointed a gun at a teller, completed the robbery and fled. The five savings and loan employees identified a photograph of petitioner Simmons, and three employees identified a photograph of petitioner

Garrett. All five made positive in-court identifications of *Simmons*, three made positive identifications of Garrett, and the other two said they did not get a good look at the second robber. None of the photographs was introduced at trial. The Court noted that there were dangers associated with the use of photographs to identify criminals, and further stated:

> This danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the picture of several persons among which the photograph of a single such individual recurs or is in some way emphasized. The chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime.

390 U.S. at 383 (footnotes omitted).

The Court concluded that the use of photographic identification procedures does not amount to a denial of due process, and noted that it was necessary for the FBI to utilize photographic identification because a serious felony had been committed, and the perpetrators were still at-large. *Id.* at 384. Additionally, the Court stated:

> [T]here was in the circumstances of this case little chance that the procedure utilized led to misidentification of Simmons. The robbery took place in the afternoon in a well-lighted bank. The robbers wore no masks. Five bank employees had been able to see the robber later identified as Simmons for periods ranging up to five minutes. Those witnesses were shown the photographs only a day later, while their memories were still fresh. At least six photographs were displayed to each witness. Apparently, these consisted primarily of group photographs, with Simmons and Andrews each appearing several times in the series. Each witness was alone when he or she saw the photographs. There is no evidence to indicate that the witnesses were told anything about the progress of the investigation, or that the FBI agents in any other way suggested which persons in the pictures were under suspicion.

*Id.* at 385.

There are notable similarities between the factors listed by the Court in *Simmons*, and the factors present in the instant case. Here, the lighting was also good; the robber wore no mask; the three employees saw the robber for several minutes; Tucker saw the robber twice and observed him with a heightened degree of attention; the photographs were shown to all of the eyewitnesses within a short period of time following the crime; several sets of photographs were displayed to each witness with the crucial set containing six black and white photographs; each witness was alone when he or she saw the photographs; and there is no evidence to indicate that the witnesses were told about the progress of the investigation or that it was suggested which person in the photographs was under suspicion.

In *Manson v. Brathwaite*, an undercover officer was involved in the purchase of narcotics. Another officer, suspecting that Brathwaite was the seller, obtained a photograph of him which was viewed by the undercover officer. The undercover officer identified Brathwaite as the seller of the narcotics. This photograph was introduced at trial. The prosecution offered no explanation for the failure to utilize a photo spread or to conduct a lineup. The Court, noting that the photographic identification procedure was less than pristine, analyzed the factors which go into determining whether the identification is nevertheless so reliable as to be admitted. First, the undercover officer viewed the narcotics seller for two to three minutes. Second, his degree of attention was considerably more than casual. Third, the accuracy of the description of the narcotics seller given by the undercover agent was so detailed that the other officer acted on that description in obtaining a photograph of Brathwaite. Fourth, the witness's level of certainty was unquestioned. Fifth, the time between the crime and the confrontation was a mere two days. Finally, the Court concluded that these reliability factors outweighed any corrupting influence of the suggestive procedure. 432 U.S. at 114-16.

In *Lesoine v. Commonwealth*, 209 Va. 399, 164 S.E.2d 642 (1968), Edward Woodley was attacked by four assailants who fired numerous shots at him. He was rushed to the hospital where, two days after the attack, police officers showed him six or eight photographs. When Woodley saw the photograph of Lesoine, he took it out of the officer's hand and said: "[T]his is the one right here." *Id.* at 401, 164 S.E.2d at 644. Testimony regarding the

photographic identification was admitted at trial. Woodley also positively identified Lesoine at trial. The Supreme Court, noting the number of photographs shown, the certainty of the identification, and the absence of suggestion from the officers, concluded that it was not error to admit evidence of the photographic identification. *Id.* at 402, 164 S.E.2d at 644.

In *Drewery* v. *Commonwealth*, 213 Va. 186, 191 S.E.2d 178 (1972), Harry S. Pullen was accosted by a masked armed robber. Pullen drew his own gun and disarmed the assailant. The assailant removed his mask and begged Pullen not to shoot him. The assailant then ran from the scene. Three months later police officers showed Pullen a group of six photographs, telling Pullen that they thought the assailant was among those pictured. Pullen identified Drewery's photograph. The Court concluded that the identification procedure was not impermissibly suggestive. It went on to state:

> While it might have been better if the officer had not expressed his belief that Pullen's assailant was among those depicted in the photographs, the officer's statement did not amount to an indication that the police had "other evidence that one of the persons pictured committed the crime," the practice criticized in *Simmons*. Moreover, we think it only reasonable to say that the mere fact the police officer wanted Pullen to view the pictures carried with it, necessarily and unavoidably, the implication that the officer believed the guilty party might be among those pictured.

*Id.* at 190, 191 S.E.2d at 181.

In *McCary* v. *Commonwealth*, 228 Va. 219, 321 S.E.2d 637 (1984), McCary was charged with robbery of a savings and loan, two counts of malicious wounding, and use of a firearm in the commission of a felony. Shortly after the crimes were committed two employees who were in the savings and loan at the time of the crimes were shown a photo spread which included a picture of McCary. Neither could identify McCary, but both stated that they thought they could identify him in person. Later, both employees were told independently that McCary was the robber. Fifteen months after the crimes, both positively identified McCary at the preliminary hearing and at trial. McCary, relying upon the inability of the employees to identify him from the photo spread,

and their acknowledgement that they were told that he was the robber, argued that the trial court erred in permitting the in-court identifications. The Court held that the inability of the employees to identify McCary from the photo spread did not render the identification testimony inadmissible, but rather was a factor to be weighed by the jury in considering the evidence. Also, the Court concluded that the identification testimony was not tainted by the employee's prior knowledge that McCary had been charged with the crimes because their in-court identifications had independent sources. *Id.* at 234, 321 S.E.2d at 645.

We now apply the principles enunciated in these cases to the instant case. We conclude that the photographic identifications were neither unduly suggestive nor likely to give rise to substantial likelihood of misidentification. For this reason, the trial court did not err in allowing Tucker, Guill and Ulrich to testify that they had identified Hill from a photo spread. Since the photographic identification procedure was not suggestive, the contention that it tainted the in-court identifications by the four eyewitnesses is likewise without merit.

·We find that the state penitentiary notation on Hill's mug shot was not unduly suggestive when considered in its proper context. Hill's photograph was contained in a photo spread that included six black and white photographs, four of which were mug shots, and three of which had prison or jail notations on them. There is no evidence that Hill's photograph was highlighted in any fashion. Therefore, in the context in which the photographs were presented, the presence of the state penitentiary notation was not unduly suggestive. We note parenthetically that many courts have held that the use of mug shots in photo spreads is not impermissibly suggestive. Annot., 39 A.L.R.3d 1000 § 4[a] (1971).

We also find that Hundley's apparent inability to identify Hill's photograph was not a demonstration of the inherent flaws in the identification procedure. Rather, that inability was merely a factor to be presented to the jury (which it was) for its consideration. *See McCary*, 228 Va. at 234, 321 S.E.2d at 645.

Finally, we address Hill's last objection to the photographic identification procedure. We find that color and black and white photographs were not mixed so as to highlight Hill's photograph. Rather, the record indicates that each eyewitness was shown sev-

eral sets of photographs and that each set consisted of either black and white or color photographs, but not a mixture. The set containing Hill's photograph consisted of six black and white photographs.

## 2. *The Lineup.*

The May 16 lineup was conducted in a room in the building housing the Botetourt County Jail. Deputy Caldwell and the three savings and loan employees testified about the details of the lineup. That testimony is consistent in every major respect. The lineup consisted of six young black males. One individual was 6'2", the others apparently ranged from 5'8" to 5'10". Hill was in this range. All wore white jail clothing. Each lineup participant held a card on which was written a number from one through six. The lineup was assembled in an upstairs room before the three employees were brought in. Before viewing the lineup, each employee was handed a lineup information form whereby they could check off the number correlating to the individual that they identified. They were told not to complete this form in the room in which the lineup was being held, and not to discuss the matter between themselves. The employees proceeded upstairs, viewed the lineup, returned downstairs, and were separated into different areas of the same rooms so that they could not see how the others completed the forms. Each employee identified Hill as the robber. The only discrepancy as to this procedure comes from the suppression hearing testimony of Donna Guill. She was asked where she marked her form. She answered "I can't remember. I think it was upstairs."

Hill alleges that the lineup procedure was so unduly suggestive as to taint the positive in-court identifications given by the three employees. He bases this assertion on three grounds: (1) that Hill was the only individual in both a photo spread and the lineup, (2) the existence of a dual (photographic and lineup) pretrial identification procedure, and (3) the fact that the employees were not told that the robber may not appear in the lineup.

In *Foster* v. *California*, 394 U.S. 440 (1969), the defendant was charged with the armed robbery of a Western Union office. The office manager was called to the police station to view a lineup consisting of Foster and two other men. Foster wore a

jacket similar to the one the office manager had seen on the robber. Additionally, Foster stood six feet in height; the other two men stood 5'5" or 5'6". The manager "thought" Foster was the robber, but he was not positive. Later, an one-on-one confrontation involving Foster and the manager was conducted. The manager could not positively identify Foster as the robber. Still later, a second lineup consisting of five men was conducted. Foster was the only individual who appeared in both lineups. This time the manager positively identified Foster as the robber. At trial, the manager testified as to the pretrial identification, and also identified Foster in the courtroom. The Court, noting among other things that Foster was the only individual who appeared in both lineups, concluded that the suggestive elements of the identification procedure made it inevitable that the manager would eventually identify Foster as the robber. *Id.* at 443. The Court reversed the judgment of conviction and remanded the case.

One year later, the Court held that a lineup was not so prejudicial and suggestive as to taint the later in-court identification of the defendant. *Coleman* v. *Alabama*, 399 U.S. 1 (1970). Petitioners Coleman and Stephens had been convicted of assault with the intent to murder. The assailant approached to within two or three feet of a Mr. and Mrs. Reynolds, and shot Mr. Reynolds two times. At a lineup conducted more than two months after the incident, Reynolds positively identified Coleman and Stephens as his assailants. The petitioners challenged Reynolds's in-court identifications on the basis that they were tainted by an impermissibly suggestive lineup procedure. The Court did not accept this argument. *Id.* at 5-6.

In *Zeigler*, the Virginia Supreme Court concluded that the lineup identifications did not violate due process so as to render evidence of them and the in-court identifications inadmissible. The Court stated:

The witnesses viewed the lineups separately and did not discuss the results of their oberservations. There was no discussion of the lineups between witnesses and police officers.

Photographs of the lineups showed that all six participants, including the three suspects, were black males. There is nothing to indicate that Zeigler and Hawkins [the two appel-

lants] were singled out. The record shows that they were not required to speak, wear distinctive clothing or perform any physical act except appear in the two lineups. They were somewhat taller and lighter skinned than the three non-suspects, one of whom was much older than the others in the lineups. The trial court considered and criticized this age discrepancy but found that the lineups were fairly conducted. We agree. There is no requirement that all participants be alike in appearance. We conclude that there was no violation of due process.

*Id.* at 638, 186 S.E.2d at 43 (citation omitted).

██ We find no merit in Hill's argument that the lineup in the instant case was conducted in an improper manner. First, although Hill was the only individual who was in both the photo spread and the lineup, this fact alone does not amount to undue suggestiveness. Hill cites to *Foster* in support of his position. However, the presence of Foster as the only individual in successive lineups was merely one factor taken into consideration by that Court in determining that the identification procedure was unduly suggestive. Here, the record indicates that each witness was shown a substantial number of photographs, and that no witness was told whether the photograph of the individual that he or she identified was that of the suspect, Hill. Viewed in this context, Hill was not deprived of due process by being the only individual in both the photographic displays and the lineup.

Hill's second contention is that use of photographic displays prior to the lineup impermissibly tainted any lineup identification. Many courts have held that evidence of a lineup identification need not be excluded merely because the same witness previously identified the defendant from a set of photographs. *See* Annot., 39 A.L.R.3d 487 § 16 (1971). We concur.

We also reject Hill's third contention that the lineup was impermissibly suggestive because the witnesses were not told that the robber may not appear in the lineup. A similar contention was put forth in *Coleman.* There, the witness "testified that when the police asked him to go to the city jail he 'took [it] for granted' that the police had caught his assailants." 399 U.S. at 6. But the Court noted that there was no evidence that the police said or did anything that prompted the lineup identification of the petitioners. *Id.*

Likewise, the witnesses viewing Hill's lineup were not prompted to identify him in any fashion. In fact, the record indicates that they were instructed to mark their lineup information forms "if" they saw the robber in the lineup.

We conclude that there were no due process violations in regard to the lineup procedure.

## C. *The Showup.*

Hill contends that Tucker's view of him (hereinafter referred to as a "showup") at work was tainted by improper procedures. Hill bases this argument on four points: (1) he argues that showups have generally been condemned and that a lineup would have been a preferable identification procedure, (2) he argues that the presence of only one other black male besides himself rendered the showup impermissibly suggestive, (3) he contends that Tucker's prior photographic identification of him tainted the showup identification, and (4) he argues that the showup procedure violated his due process rights because Tucker assumed that he would see the robber when he was asked to accompany the authorities to the hospital.

Showups have long been a source of concern for the courts. In *Stovall* v. *Denno*, 388 U.S. 293 (1967), that Court noted that "the practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." *Id.* at 302 (footnote omitted). Yet, no violation of due process was found in that case because there was an immediate need for identification due to the serious physical condition of the victim. Thus, under a totality of the circumstances analysis, the one-on-one confrontation was imperative. *Id.*

In *Neil* v. *Biggers*, 409 U.S. 188 (1972), a rape victim viewed lineups, showups, and photographs in the seven months following the incident. She identified no one from these procedures. Finally, in a showup confrontation, she identified Biggers as her assailant. The Court found that the identification was reliable and that there was no substantial likelihood of misidentification. *Id.* at 201. The Court listed factors to be considered in evaluating the likelihood of misidentification. *Id.* at 199. Those factors were listed in Part I.B., *supra*, and will not be repeated here.

The Virginia Supreme Court has also dealt with the question of showups. In *Lesoine* v. *Commonwealth*, 209 Va. 399, 164 S.E.2d 642 (1968), after the victim identified Lesoine's photograph, Lesoine was apprehended and taken to the victim's hospital room for an one-on-one confrontation. The victim identified Lesoine as one of his assailants. The Supreme Court concluded that the trial court did not err in admitting evidence that the victim identified Lesoine at the hospital. *Id.* at 403-04, 164 S.E.2d at 645.

In *Martin* v. *Commonwealth*, 210 Va. 686, 173 S.E.2d 794 (1970), Robert Mason was attacked by two would-be robbers. The police arrived on the scene shortly after the attack, gathered a description of the assailants, and stopped two individuals who matched the description as they were walking down the street about six blocks from the scene of the crime. Mason was taken to this location where he positively identified the two, one of whom was Martin, as his attackers. At trial, Mason was not "absolutely sure" that Martin was one of the assailants. *Id.* at 688, 173 S.E.2d at 796. Therefore, the Commonwealth called a police officer to the witness stand who testified that on the night of the crime Mason identified Martin as one of his assailants. Martin argued that circumstances under which Mason identified him were unduly suggestive and required exclusion of all identification evidence. The Supreme Court held that under the circumstances of the case, the identification procedure was not unnecessarily suggestive. *Id.* at 691, 173 S.E.2d at 798-99.

In *Henry* v. *Commonwealth*, 211 Va. 48, 175 S.E.2d 416 (1970), Henry was accused of robbing a grocery store. Twelve days after the robbery, Henry was apprehended and taken to the store, where the owner positively identified him. Henry argued that, under the circumstances, a lineup should have been conducted instead of a showup. The Court affirmed the conviction, and concluded that "the evidence was such that there was no reasonable possibility that the pretrial identification contributed to the conviction." *Id.* at 52, 175 S.E.2d at 419.

We now turn to consideration of Hill's arguments in regard to the showup. First, he argues, as did the appellant in *Henry*, that showups are generally frowned upon and that the better police procedure would have been to conduct a lineup. We agree that, when the circumstances permit, a lineup is preferable to a showup. However, our task is to decide if the identification proce-

dure that was utilized violated due process; not whether that procedure was the best that the authorities could have employed. Thus, Hill's argument on this point is merely one factor to be taken into consideration in evaluating the circumstances surrounding the identification procedure.

Second, Hill contends that the showup was improper because only Hill and one other black male were in the room in which Tucker was told to look. Again, this is a factor to be taken into consideration in determining the totality of the circumstances surrounding the identification procedure, but does not, standing alone, render that procedure unduly suggestive.

Hill's third contention is that Tucker's prior view of the photo spreads, and identification of Hill by that process, tainted the showup identification procedure. This argument is similar to one advanced by Hill in reference to the lineup identifications. *See* Part I.B.2., *supra.* We find no need to repeat the discussion of this issue at this stage, but do note that the Virginia Supreme Court was confronted with a similar situation in *Lesoine* and found no error.

Hill's fourth contention is that Tucker's identification of him at the hospital was a self-fulfilling prophecy in that Tucker assumed he would see the robber when asked by the police to accompany them to that location. The witness in *Martin* expressed similar assumptions in a similar situation. It is quite natural that a witness would assume that he would view a suspect when asked to participate in most identification procedures. Indeed, the Virginia Supreme Court, in a photo spread case, noted that "we think it only reasonable to say that the mere fact that the police officer wanted Pullen [the witness] to view the pictures carried with it, necessarily unavoidably, the implication that the officer believed the guilty party might be among those pictured." *Drewery* v. *Commonwealth*, 213 Va. 186, 190, 191 S.E.2d 178, 181 (1972).

In determining whether any suggestive influences in the hospital showup were outweighed by the reliability of the identification, we must consider the factors listed by the United States Supreme Court in *Neil* v. *Biggers*, 409 U.S. 188, 199 (1972); *see also Smith* v. *Thompson*, 1 Va. App. 407, 411-12, 339 S.E.2d 556, 558 (1986). First, Tucker had an excellent opportunity to view the robber immediately prior to and following the commission of the

crime. Second, Tucker's attention was specifically directed at the robber because Tucker initially thought that he was an old acquaintance, but soon realized his mistake. Third, Tucker's description of the robber, which included a description of his clothing, was accurate. Fourth, Tucker stated that he was "99 percent" certain of his identification at the showup. Fifth, less than two weeks passed in between the commission of the crime and the confrontation. In light of these factors, we find that Tucker's identification of Hill at the Catawba Hospital was reliable, and that there was no substantial likelihood of misidentification.

D. *The Alleged Contradiction in the Testimony of the Witnesses.*

Hill argues that the witnesses contradict each other on three major points that show that the identification procedures produced tainted evidence. First, he refers to the uncertainty of some witnesses as to when they viewed black and white photographs and when they viewed color photographs. Second, he repeats the argument that Hundley's apparent misidentification of photographs demonstrated a flaw of identification procedure and produced tainted evidence. Third, he argues that the evidence was unclear as to where the witnesses marked their lineup information forms, and whether each witness could see how the others were marking their forms. All three contentions have been discussed in some detail in Part I.B., *supra*, and we find no need to discuss these matters further at this time. We find no error.

## II.

Hill contends that his constitutional protection against double jeopardy was violated when he was convicted of both robbery and entry of a banking house with the intent to commit larceny while armed with a deadly weapon. We find no merit in this contention.

A review of this contention is governed by the test laid down by the United States Supreme Court in *Blockburger* v. *United States*, 284 U.S. 299 (1932). That Court stated:

The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the

test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.

*Id.* at 304 (citation omitted); *see also Jones* v. *Commonwealth*, 218 Va. 18, 21, 235 S.E.2d 313, 314-15 (1977). The Supreme Court later stated that "if each [offense] requires proof of a fact that the other does not, the *Blockburger* test is satisfied notwithstanding any substantial overlap in the proof offered to establish the crimes. *Iannelli* v. *United States*, 420 U.S. 770, 785 n.17 (1975).

The elements of robbery are "the taking, with the intent to steal, of the personal property of another, from his person or in his presence, against his will, by violence or intimidation." *Johnson* v. *Commonwealth*, 215 Va. 495, 496, 211 S.E.2d 71, 72 (1975); *see also Hairston* v. *Commonwealth*, 2 Va. App. 211, 214, 343 S.E.2d 355, 357 (1986). Code § 18.2-93 provides that "if any person, armed with a deadly weapon, shall enter any banking house, in the daytime or in the nighttime, with intent to commit larceny of money, bonds, notes, or other evidence of debt therein, he shall be guilty of a Class 2 felony."

The Virginia Supreme Court recognized the distinction between common law robbery and Code § 18.2-93 in *Cox* v. *Commonwealth*, 218 Va. 689, 240 S.E.2d 524 (1978). There, the Court stated that "the General Assembly, not intending to enlarge, decrease or change the common law crime of robbery, enacted the statutory ancestor of § 18.2-93, under which the crime is complete when a person, armed with a deadly weapon, enters a banking house with the requisite larcenous intent." *Id.* at 691, 240 S.E.2d at 526. In this light, a person convicted under Code § 18.2-93 need not have taken the personal property of another. On the other hand, a conviction for common law robbery does not require proof of entry of a banking house with a deadly weapon. Clearly then, each offense "requires proof of an additional fact which the other does not." *Blockburger*, 284 U.S. at 304. As such, Hill's convictions for both offenses did not violate the double jeopardy clause.

## III.

 Lastly, Hill contends that the evidence was insufficient to support the convictions. As always on appeal of a criminal conviction, we view the evidence in the light most favorable to the Commonwealth, giving it all inferences fairly deducible therefrom. *Higginbotham* v. *Commonwealth*, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975); *Sutphin* v. *Commonwealth*, 1 Va. App. 241, 243, 337 S.E.2d 897, 898 (1985).

We find that the positive in-court identifications of Hill, coupled with the detailed testimony of Stacy Layne, and the evidence of Hill's delivery of $6,000 to a relative soon after the robbery, constitutes sufficient evidence to support the convictions.

*Conclusion.*

In summary, we hold that even if it was error to admit evidence of the lineup identifications due to the absence of counsel, such an error did not taint the positive in-court identifications made by the witnesses which had origins independent of the May 16 lineup. These positive in-court identifications, together with the other evidence of guilt, are sufficient to support the convictions.

We also hold that Hill's due process rights were not violated in the conduct of the photographic, lineup and showup identification procedures. These procedures either were not unduly suggestive, or any suggestiveness was outweighed by the reliability of the identification. In addition, there is no contradiction in the testimony of the witnesses which would mandate reversal.

Furthermore, we find that Hill's constitutional protection against double jeopardy was not violated when he was convicted of robbery and entry of a banking house with the intent to commit larceny while armed with a deadly weapon. Each offense requires proof of a fact which the other does not.

*Affirmed.*

Coleman, J., and Moon, J., concurred.