**Alexandria**

## ANTHONY A. YARBOROUGH

v.

## COMMONWEALTH OF VIRGINIA

Record No. 1039-91-4

Decided January 26, 1993

COUNSEL

Blake K. Woloson (Law Offices of O. Keith Hallam, Jr., on briefs), for appellant.

Margaret Ann B. Walker, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

**BAKER, J.**—Anthony A. Yarborough (appellant) appeals from a judgment of the Circuit Court of Arlington County (trial court) which approved his jury convictions for robbery and use of a firearm in the commission of a felony. Appellant asserts that the evidence was insufficient to support the conviction for use of a firearm. He further argues that the initial "show-up" identification was so unduly suggestive that it "tainted" any subsequent identification of appellant made by Susan Konchal (the victim). For that reason, he contends that the trial court should have refused to admit any evidence of identification made by the victim. He further avers that if we do not agree that the "show-up" evidence was tainted and find that the record contains sufficient evidence to support the robbery and use of a firearm convictions, nevertheless, on the basis of after-discovered evidence he is entitled to have the robbery and firearm convictions set aside and a new trial ordered because the Victim Impact Statement filed with the pre-sentence report showed that the victim was racially biased against all blacks. We recite the evidence in the light most favorable to the

Commonwealth, granting to it all reasonable inferences fairly deducible therefrom. *Evans v. Commonwealth*, 215 Va. 609, 612, 212 S.E.2d 268, 271 (1975).

On November 13, 1990, at approximately 7:47 p.m., the victim, in the lobby of her office building, withdrew sixty dollars from the ATM machine and began to walk home. As she was walking, she heard footsteps and turned to see a jogger running toward her. The jogger ran past her, circled back, confronted her and said: ''This is a stick up, give me all your money.'' The jogger/robber moved toward the victim, and with both hands in his pockets pointed at her what looked like the shape of a gun. At this point, the victim opened her purse and wallet and gave him the three twenty-dollar bills she had just taken out of the ATM machine. The robber also reached into her purse with his left hand and took two one-dollar bills. At the time, he was approximately six inches away from her. The victim observed that something was protruding from the right-hand pocket of the robber's jacket, and believed this to be a gun.

When the robber ran away, the victim went to her home, dialed 911, and gave a general description of the robber. The victim described the robber as a black male, between 5'9'' and 6' tall, of medium build, with almond shaped eyes, and wearing a hat, a short red jacket with a high collar, dark pants and running shoes. She described his running shoes as the same brand as the ones that she was wearing.

Officer McCarten came to the victim's home soon after she reported the crime to see if she could provide any additional information. McCarten testified that the victim told him that she told the dispatcher that the robber wore a hat but that now she was not sure whether he had a hat. He had been at the victim's home for only a few minutes when he heard by radio that a suspect had been picked up nearby at the Pentagon City Metro station. He commented to the victim that ''[t]hey usually don't get them this quick.'' The victim rode with the officer to the station to determine if the suspect was the robber. From across the street, approximately 150 to 200 feet, she observed and identified appellant as the robber. The clothes he wore and his height and build were as generally described by the victim to the police. The police thereafter brought the victim closer, where she again identified appellant as the man who had robbed her. While being identified, appellant was surrounded by several uniformed police officers. In addition to the ''show-up,'' the victim also identified appellant in court as the man who had robbed her.

At trial, the victim testified that as appellant reached with his right hand for the money she was handing him, and as he was digging in her purse with his left hand, she did not look to see if anything was protruding from his pocket because she was looking "right at his face." She believed no gun actually touched her.

Officer Ballanger testified that he received a dispatch to lookout for the robber. He went into the Metro station and saw an individual who matched the description given over the radio. He saw no one else who fit the description of the robber. As he approached appellant, his first observations were that appellant was darting his eyes around, looked very nervous and looked as though he were trying to find some avenue of escape. Appellant began to put his hands in his pockets, but Ballanger grabbed his arm and told him to keep his hands out of his pockets. Appellant "became verbally combative at first, saying something like, 'Why are you white guys always picking on me? I didn't do anything wrong.'" Ballanger patted him down and found no weapons. He did feel a hard object which turned out to be an unopened can of beer. Ballanger radioed for another unit and with other officers escorted appellant to the street level to let the victim attempt to identify him. Appellant stated to Ballanger that he had just gotten off work and that he did not do anything.

After appellant was arrested and taken from the area, the police searched the surrounding area for fruits of the crime but found none.

## I. THE FIREARM

Appellant argues that in order to sustain a conviction for violation of Code § 18.2-53.1, the record must show that a firearm was used in the commission of a felony. In relevant part, that Code section provides:

It shall be unlawful for any person to use or attempt to use any pistol, shotgun, rifle, or other firearm or display such weapon in a threatening manner while committing or attempting to commit murder, rape, robbery, burglary, malicious wounding as defined in § 18.2-51, or abduction.

■ Our Supreme Court has held that the "purpose of Code § 18.2-53.1, keyed to serious crimes and prescribing inflexible penalties, is to deter violent criminal conduct. The statute not only is aimed at

preventing actual physical injury or death but also is designed to discourage criminal conduct that produces fear of physical harm." *Holloman v. Commonwealth*, 221 Va. 196, 198, 269 S.E.2d 356, 358 (1980) (citations omitted). In *Cromite v. Commonwealth*, 3 Va. App. 64, 348 S.E.2d 38 (1986), we affirmed a conviction pursuant to Code § 18.2-53.1 even though the hold-up victim did not see a weapon and surrendered his valuables to the robber because he feared the object pressed against him was a pistol.

> "The presentation of a deadly weapon is not always necessary to place a person in fear. The apprehension that the person attempting a robbery has in his possession a deadly weapon, and the fear that he might use the same, is just as effective to place one in fear as if the weapon is drawn and presented."

*Id.* at 66, 348 S.E.2d at 39 (quoting *State v. Young*, 134 W. Va. 771, 781, 61 S.E.2d 734, 740 (1950)). Thus, actual sighting of the weapon is unnecessary for a conviction under Code § 18.2-53.1. In *Cromite*, we further said:

> We are convinced that, as to firearms, Virginia has heretofore adhered to the subjective standard and we believe under the circumstances of this case that this is the proper standard. To hold otherwise would encourage criminals using firearms to conceal them in some way while perpetrating the crimes. It would give the criminal an advantage not intended by the General Assembly in its enactment of this statute and add to the frustration of the blameless victims.

> Most of us are endowed with the five senses of sight, taste, touch, hearing and smell. While the evidence would have been more conclusive had [the victim] seen a firearm, we cannot disregard the totality of his testimony.

*Id.* at 67-68, 348 S.E.2d at 40. In the present case, we will not disregard the testimony of the victim. Although she saw no gun, she gave appellant money and permitted him to reach into her purse and take more because she saw an impression in appellant's pocket of what she believed was a gun and heard him say that this was a "stick up." She was intimidated to surrender her money because she believed appellant possessed a gun. Although no gun was found on appellant, he may have had a gun in his right pocket at the time of the offense. As in *Cromite*, from the totality of circumstances, it could be

inferred that he had one. As noted above, the purpose of the statute is to prevent such intimidation by inducing fear of physical harm. We adhere to the subjective standard approved by *Cromite* and find the evidence sufficient to support appellant's conviction for violating Code § 18.2-53.1.

## II. THE IDENTIFICATION

Appellant next argues that the trial court erred when it failed to suppress his motion to exclude all identification evidence. He asserts that the initial identification made by the victim shortly after appellant was detained was constitutionally flawed to the extent that any later identification of appellant as the robber was so tainted that none of the latter identifications should have been admitted into evidence. We disagree.

■ Show-up identifications are not *per se* violative of constitutional rights. *Smith v. Thompson*, 1 Va. App. 407, 411, 339 S.E.2d 556, 558 (1986). The United States Supreme Court has held that such identifications will not be declared invalid unless a review of the totality of the circumstances shows a substantial likelihood of misidentification. *See Manson v. Brathwaite*, 432 U.S. 98, 116 (1977); *Delong v. Commonwealth*, 234 Va. 357, 366, 362 S.E.2d 669, 674 (1987), *cert. denied*, 485 U.S. 929 (1988).

■ In *Neil v. Biggers*, 409 U.S. 188 (1972), the Court listed five factors to be used in determining whether the totality of the circumstances justifies the exclusion or admission of the show-up identification and other identifications that follow. We must consider (1) the opportunity of the witness to view the accused at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the suspect; (4) the level of certainty demonstrated by the witness at the time of the initial confrontation; and (5) the length of time between the crime and the confrontation. *Id.* at 199-200; *Townes v. Commonwealth*, 234 Va. 307, 331, 362 S.E.2d 650, 663-64 (1987), *cert. denied*, 485 U.S. 971 (1988). When the victim viewed appellant, he was close enough to reach his hand into her purse and she looked "right at his face." She gave a detailed description of his skin color, physical characteristics and clothing, including his running shoes, that enabled the police swiftly to locate and detain him in the general area where the crime occurred. In her first show-up identification, the victim stated that appellant's clothing, build and the "way he was standing" were those of the robber. The initial identification was made within fifteen minutes after the robbery, and a second

identification was made a short time later at a closer range. Under the totality of circumstances, we find that the identification was reliable.

Appellant also argues that Officer McCarten's remark that "they usually don't get them this quick" suggested that the person who had been detained was in fact the robber and, therefore, unconstitutionally tainted all subsequent identifications made by the victim. We disagree. We need not decide in this case whether that remark, standing alone, unconstitutionally tainted the identifications. Here, at the time of the crime, the victim had the opportunity to view the accused clearly and had an unobstructed close-up view of his face. The victim also accurately described the accused and the clothes he wore. Finally, the length of time between the crime and the identification confrontation was short, and the level of certainty demonstrated by the victim at that time was great. These facts disclose a totality of circumstances that justifies the admission of her identification evidence. The trial court did not err when it refused to suppress the identification evidence. *See Martin v. Commonwealth*, 210 Va. 686, 691-92, 173 S.E.2d 794, 798-99 (1970); *Hill v. Commonwealth*, 2 Va. App. 683, 704-05, 347 S.E.2d 913, 925 (1986).

## III. THE AFTER-DISCOVERED EVIDENCE

At the conclusion of the evidence and argument and after deliberation, the jury returned its verdict convicting appellant for robbery and use of a firearm in the commission of that felony. After the trial court entered judgment on those verdicts, appellant's motion for a presentence report was granted. The sentencing hearing was set for May 24, 1991, at which time, after reviewing the report, the sentence recommended by the jury was imposed by the trial court. Attached to the report was a Victim Impact Statement that is the basis for appellant's assertion that the trial court erred when it refused to grant appellant's motion to set aside the verdicts and grant him a new trial.

At the May 24, 1991 sentencing hearing, the trial court asked appellant if he had read and discussed the report with his counsel. Appellant responded in the affirmative. After hearing witnesses and the statements of appellant and his counsel, the trial court imposed the sentence recommended by the jury. Thereafter, on June 10, 1991, appellant filed a written motion for a new trial, saying:

In support of which, the Defendant avers as follows:

1. That the victim's statements made to the Probation Officer as to how the crime effected [sic] her, represents new, after-acquired evidence showing extreme a [sic] bias and prejudice against black people. A copy of the victim's statement showing such prejudice and bias is attached hereto as Exhibit 1.

2. That the only evidence given against the Defendant was the victim's eyewitness statement that he robbed her, making her testimony a key issue in the trial.

No affidavits were filed in support of that motion.

The Victim Impact Statement leaves no doubt that, because of the robbery and subsequent events, the victim harbors extreme bias toward blacks. The statement further reveals that those feelings were of recent origin. Prior to her current employment, the victim had been a successful employee at a minority-owned company and was neither biased nor bigoted. She had been responsible for hiring blacks and worked with them daily. At her current place of employment, she earned more than $50,000 annually and suffered no major loss by the theft of the sixty dollars. However, the Impact Statement reported that the trauma of the robbery, the emotional experience of participating in the preliminary hearing and trial, being challenged on cross-examination, hearing defense witnesses who, in her opinion perjured themselves, and suffering threats to her person by appellant's friends, all had a detrimental effect on her health, her job and her regard for black people. On an individual basis, she does not distrust them, but now she distrusts black people and requires individual blacks to prove themselves. Until they ''prove themselves'' worthy she now considers the race to be ''uncivilized members of society.'' She believes that the robbery has ruined her right to a happy life because she no longer feels safe in her neighborhood, in her home or walking to and from work. Now, under medical direction, she has to take relaxant drugs and no longer believes her work place is safe. She has become belligerent toward black co-workers, resulting in reprimand from her employer.

Appellant argues that the Victim Impact Statement was not prepared until after the trial and, therefore, he contends that he ''had no way to ascertain the racial bias shown by the victim'' that could have affected the verdict because it was exclusively her testimony that established appellant to be the robber. In his brief, counsel for appellant further asserts:

The only way for trial counsel to have ascertained the racial bias of [the victim] would have been to ask a potentially inflammatory question in front of the jury. With a sympathetic victim on the stand, the Jury would have felt even more empathy for her being "Attacked" a second time by trial counsel.

At oral argument, counsel conceded that he attended the preliminary hearing. At that hearing, he could have discovered any bias the victim may have had at that time without incurring possible jury "wrath." At trial, he entertained the idea of questioning her concerning any bias she might have but for reasons of trial strategy decided not to pursue such questions.

The record contains no affidavit that such evidence could not have been discovered prior to trial or that due diligence had been used in an attempt to learn of its existence. Appellant has not shown any effort made prior to trial to determine if the victim was biased or bigoted.

In *Fulcher v. Whitlow*, 208 Va. 34, 155 S.E.2d 362 (1967), the Court emphasized the requirement for the exercise of due diligence to secure evidence claimed to be discovered after the trial.

[A] party who seeks a new trial on the ground of after-discovered evidence must show that he used reasonable diligence to secure such evidence before the earlier trial. It is not sufficient merely to say that the evidence could not have been discovered by the use of due diligence. The applicant for a new trial must set forth in affidavits facts showing what his efforts were to obtain the evidence and explaining why he was prevented from securing it.

*Id.* at 38, 155 S.E.2d at 365. *See also Carter v. Commonwealth*, 10 Va. App. 507, 512-14, 393 S.E.2d 639, 642-43 (1990). Here, no affidavits were filed and both at the preliminary hearing and at trial appellant could have elicited testimony regarding any bias the victim may have harbored.

■ In any motion for a new trial based on after-discovered evidence, the moving party must establish that the evidence appears to have been discovered subsequent to the trial, that it could not have been secured by the applicant for use at the trial in the exercise of reasonable diligence, that it is not merely cumulative, corroborative or collateral, and that it is material, and such as would produce opposite results at another trial. *Id.* at 512, 393 S.E.2d at 642. *See also Odum v. Commonwealth*, 225 Va. 123, 130, 301 S.E.2d 145, 149 (1983).

Motions for a new trial based on after-discovered evidence are addressed to the sound discretion of the trial judge. They are disfavored, are considered with special care and caution, and are to be awarded with great reluctance.

*Payne v. Commonwealth*, 233 Va. 460, 472, 357 S.E.2d 500, 507, *cert. denied*, 484 U.S. 933 (1987). We find that appellant failed to file the required affidavits, that he failed to show that he used due diligence to discover the evidence he relies upon to obtain a new trial, that the record discloses he had the opportunity to determine any bias the victim might have had at the time of the trial, and that the trial court did not abuse its discretion in denying appellant's motion for a new trial.

For the reasons stated, we affirm the judgments of the trial court.

*Affirmed.*

Coleman, J., and Fitzpatrick, J., concurred.