# CIRCUIT COURT OF THE CITY OF NORFOLK

Commonwealth of Virginia

v.

Wally Nathanial Boone

April 27, 2001

Case No. CR 00003395

BY JUDGE LYDIA CALVERT TAYLOR

This matter came before the Court for a bench trial on charges of robbery, abduction, attempted capital murder of a police officer, and use of a firearm in the commission of a felony. The Defendant pleaded not guilty, waived a jury, and was tried by the undersigned. The following constitute the factual findings by this Court.

*Factual Background*

On June 22, 1999, Yolanda Holtz, the store manager, and King S. Williams, III, an employee, were working in the Blockbuster Video store on Tidewater Drive in Norfolk. While in the front of the store, near the three cash registers, they were confronted by a black male, approximately 5'11" in height, who pulled a handgun from inside his pants and pointed it at Williams. He told Holtz and Williams to open the registers; when Williams said he was unable to open his, Holtz opened it for him, and Williams emptied the register, turning the money over to Holtz, who then turned it over to the gunman. At the gunman's instructions, Holtz then emptied the other two cash registers, placed the money in a white and blue plastic Blockbuster bag, and gave the bag to the gunman.

After he had the money, the gunman determined no one was in "the back," so he had the employees walk to the back office, Holtz in front, Williams behind her, and the gunman behind Williams, holding the gun to Williams's back. When the three entered the office, the gunman told Holtz to open the safe, and Williams to pull the telephone out of the wall, and then sit down. Holtz turned the contents of the safe over to the gunman after placing them inside the plastic Blockbuster bag. After Holtz gave the gunman the security camera videotape upon his demand, the gunman thanked Holtz and Williams, told them to have a nice day, and then left the store.

Several police officers, notified of the robbery, responded to the scene, among them Detective Ransom Wensel, who spoke to Holtz and Williams about the incident. The two described the gunman as a black male, approximately 25 to 30 years old, 5'9" to 5'10" tall, dark complexioned, possibly having a mustache, armed with a silver handgun, and wearing a gray shirt, long dark pants, blue and white tennis shoes, and a light blue baseball cap with the letters NC on the front of the cap. Officer R. E. Williams — on duty, in uniform, in a marked unit — was in the same shopping center as the Blockbuster store, although about one quarter mile away, when he received a radio message describing the robbery. He recalls the description as that of a black male, in a dark gray sweatshirt, dark-colored shorts, and light blue baseball cap — perhaps a North Carolina Tarheel cap — possibly riding a bicycle. As soon as he heard the description, Officer Williams saw a black male on a bicycle approaching from the direction of the Blockbuster; when the man got within fifty yards of him, Officer Williams could see that the man matched the description of the robbery suspect.

Officer Williams followed the suspect onto Stanley Street, drove to within ten to fifteen feet of him, and rolled down his window to get him to stop. In

response, the suspect jumped off the bicycle, pulled out a chrome handgun, fully extended his arm, and fired directly at the windshield of the police car — one bullet went through the windshield and lodged in the dashboard — and then fired two additional shots. Officer Williams testified he observed the suspect, the gun still in his right hand, his arm still fully extended, walking toward the center of the police car, with the officer still inside. The officer fired several rounds through his windshield toward the suspect, who ran and then hit the ground as a black videotape went up in to the air and fell to the ground. Forensic investigation revealed that three shots came from the outside of the police car: one went through the front windshield; another entered the hood; a third entered the top part of the grill on the driver's side front of the car.

The day after the incidents, the two Blockbuster employees separately identified the Defendant in photo lineups as the gunman who robbed them. Officer Williams, however, was unable to get a good look at the face of the suspect who shot at him in the police car.

On June 24, 2000, the Defendant was arrested. After he was advised of his legal rights, he made an oral and a written statement to Officer Wensel in which he admitted that he robbed the Blockbuster store employees, fled, and then got into a shootout with a police officer.

*Discussion*

*Out-of-Court Identifications*

The Defendant asserts that the out-of-court identifications of him by Holtz and Williams were unconstitutional because, after each witness independently selected the Defendant's photograph from a photo array, the police investigator told them that they had selected the same person and the right man. Thus, he claims, any subsequent in-court identifications by these witnesses were impermissibly tainted by that earlier suggestion.

Evidence of an out-of-court identification "will be admitted if either (a) the identification procedure was not unduly suggestive, or (b) the procedure was unduly suggestive, but the identification is so reliable, in accordance with the factors noted in *Biggers* and *Brathwaite*, that there is no substantial likelihood of misidentification." *Hill v. Commonwealth*, 2 Va. App. 683, 693, 347 S.E.2d 913, 918 (1986). Even if evidence of an out-of-court identification cannot be admitted, however, an in-court identification may still be permissible if the origin of the identification is independent of the inadmissible out-of-court identification process. *See Hill*, 2 Va. App. at 693,

347 S.E.2d at 918. In establishing the reliability of a particular identification, the court must consider:

> the *opportunity* of the witness to view the criminal at the time of the crime, the witness' degree of *attention*, the *accuracy* of the witness' prior description of the criminal, the level of *certainty* demonstrated by the witness at the confrontation, and the length of *time* between the crime and the confrontation.

*Townes v. Commonwealth*, 234 Va. 307, 331, 362 S.E.2d 650, 663 (1987) (emphasis added) (quoting *Biggers*, 409 U.S. at 199, *cert. denied*, 485 U.S. 971 (1988)); *Delong v. Commonwealth*, 234 Va. 357, 367, 362 S.E.2d 669, 674 (1987), *cert. denied*, 485 U.S. 929 (1988). The United States Supreme Court in *Manson v. Brathwaite*, 432 U.S. 98 (1977), added that the *Biggers* factors must be balanced "against the corrupting effect of the suggestive identification itself." *Id.* at 114. The reliability of the identifications of Defendant here will be addressed through an application of the *Neil v. Biggers* factors to the specific facts of this case.

### Application of Neil v. Biggers Factors

The Court will first apply the five *Neil v. Biggers* factors to the photo identifications. First, both witnesses had ample *opportunity* — between five and ten minutes — to observe the Defendant during the robberies, in a well-lit video store. The robber did not wear a mask, or sunglasses, or anything else that would obstruct their view of his face. When the robber approached the witnesses at the counter, he was approximately one foot away from them. Second, the witnesses paid *attention* to the robber, allowing them to give extensive descriptions to the police right after the robberies. They described his race, gender, height, weight, and clothing, including the types and colors of the articles of clothing worn, right down to the insignia on his hat. Third, their initial descriptions as given to the police were *accurate* and consistent. Fourth, after the witnesses took enough time at the photo lineup to observe the photos carefully, each separately selected the photograph of the Defendant, each stating he or she was *certain* of the identification made.[1] Fifth, that

---

[1] The witnesses were instructed, prior to looking at the photographs, that the suspect's might look different in a photograph, either because the photograph was old or because a person's appearance can change. Each was told to look carefully at the photos before selecting one. Each witness reviewed the photographs separately; one witness did not watch the other witness select a photograph. Holtz

pretrial identification took place within a day of the robberies — less than twenty-four hours after each had observed the robber in the store — while the incident was still fresh in the witnesses' minds. Thus their out-of-court identifications were sufficiently reliable under the *Biggers* test to be admissible because of the witnesses' independent sources for their out-of-court identifications.

## *Suggestive Nature of the Photo Identification*

Defendant then asserts that, after the out-of-court identifications were made, police statements to witnesses that they had both selected the same photo, have impermissibly tainted their later in-court identifications by suggestiveness. Defendant's brief asserts that the police told the witnesses that they had "picked the right man," but he refers the Court to page 82 of the transcript, which does not say that, nor could the Court find such a statement anywhere else in the transcript. There certainly is no evidence that the police told the witnesses *prior* to the photo lineup that the suspect's photo was among those shown. The Court therefore finds that the police did not tell the witnesses their selections had been correct. Although the Defendant's *name* was mentioned to Williams the day after the robbery (see pp. 81-82), but not *prior* to the lineup, no names at any rate were attached to the photos they were shown. After a defendant is identified, arrested, arraigned, and present at a preliminary hearing and then trial, witnesses naturally become aware of a defendant's name. Those witnesses are likely to confirm who the defendant is from the fact that he is seated at the defense table, plus other factors at times, such as jail clothing, all of which could lead a witness to link a defendant with the crime for which he is on trial and suggest who he is. Those ordinary and usual criminal procedure processes, however, do not constitute "coaching" by the Commonwealth; nor does any suggestiveness of where defendant is seated or how he is dressed at a hearing automatically disqualify any subsequent identification as tainted where an unsuggestive pretrial identification has been made.

Under the totality of the circumstances, this Court finds the witnesses' in-court identifications, as well as the out-of-court identifications, had independent sources free from taint, particularly in light of the witnesses'

---

testified that she "thoroughly looked over all the pictures . . . and then picked number 2," and that she selected the Defendant's picture because of his lips, dark complexion, and facial hair. Williams selected the Defendant's photograph after looking at the photographs for approximately one minute.

ample opportunity to observe the unmasked robber for five to ten minutes in a well-lit store.

## Robbery

The Defendant begins his discussion of the abduction charges by attempting to characterize the robbery as robbery of the store ("total theft" interpretation), rather than robbery of the employee in the store. This characterization is inconsistent with Virginia law. In *Sullivan v. Commonwealth*, 16 Va. App. 844, 433 S.E.2d 508 (1993), the Court of Appeals affirmed two robbery and two use of firearm in robbery convictions, denying defendant's argument that a single robbery occurred and the second robbery conviction was double jeopardy. In *Sullivan*, the defendant approached the counter of a video store as it was closing, and drew a gun from his clothing, pointed the gun at the video store employees, and threatened to kill them if they did not follow his instructions. When the defendant told one of the employees to give him money, the employee, who was new, did not know where the money was kept. Therefore, the other employee directed the new employee, who collected the money, placed it in a bag, and handed it to the defendant. Rejecting the argument that only one robbery occurred, the Court of Appeals found two robberies where both employees were intimidated and assaulted, both "were custodians of the store's money and jointly possessed it," and money in their joint possession was taken. Although only one employee physically surrendered money to the defendant, "[the defendant] forced [the other employee] to assist in the collection of the money. Thus, he forcibly took money from [the other employee's] possession. He intimidated each employee and obtained the money through the agency of that intimidation." Under these facts, the court held that the defendant committed two robberies. *Id.* at 846, 433 S.E.2d at 509.

The Court of Appeals noted that seven years earlier in *Jordan v. Commonwealth*, 2 Va. App. 590, 347 S.E.2d 152 (1986), it had addressed the issue of multiple punishments for robbery in a store when several persons were victimized. The defendant in *Jordan* "pointed a gun at two employees and obtained money, which belonged to their employer, from each of them." *Id.* at 596, 347 S.E.2d at 156. The court in *Jordan* had rejected the defendant's contention that only one robbery occurred, holding that, "because the essential character of both Code § 18.2-58 and common-law robbery is violence against a person for the purpose of theft . . . the appropriate 'unit of prosecution' is determined by the number of persons from whose possession property is taken separately by force or intimidation." *Id.* (citation omitted).

The Defendant, in fact, was not charged with robbing Williams, but only Holtz. This Court finds sufficient evidence beyond a reasonable doubt, including the Defendant's statement to the police, to convict the Defendant of the robbery and use of a firearm in the robbery of Holtz.

### Abduction

The Defendant argued that the evidence was not sufficient to find him guilty of the two counts of abduction, specifically, that no restraint of the two victims occurred except that which was a necessary element of robbery. This argument, however, could only pertain to Holtz, because the Defendant was not charged with robbing Williams. Therefore, any detention of Williams needed to prove he abducted Williams and used a firearm in commission of that abduction of Williams would not be duplicative of any detention needed to rob Williams, as the Defendant was not charged with robbery of Williams. As he was charged with and the Court has found him guilty of robbing Holtz, that detention must be examined to see if it is duplicative.

The Virginia Supreme Court addressed the issue of separate penalties for abduction and other crimes involving restraint of a victim in *Brown v. Commonwealth*, 230 Va. 310, 337 S.E.2d 711 (1985):

> One accused of abduction by detention and another crime involving restraint of the victim, both growing out of a continuing course of conduct, is subject upon conviction to separate penalties for separate offenses only when the detention committed in the act of abduction is separate and apart from, and not merely incidental to, the restraint employed in the commission of the other crime.

*Id.* at 314, 337 S.E.2d at 713-14. Therefore, any detention of a victim, which is necessary for a conviction for abduction — separate and apart from a conviction for another crime of restraint, such as robbery — must be greater than the restraint that is intrinsic in that other crime of restraint, here, robbery. *Hoke v. Commonwealth*, 237 Va. 301, 311, 377 S.E.2d 595, 600 (1989), *cert. denied*, 491 U.S. 910 (1989).

In *Coram v. Commonwealth*, 3 Va. App. 623, 352 S.E.2d 532 (1987), the victim parked her car on a well-lit street and walked from her car to the front steps of her apartment, which area was lighted by a porch light. The defendant grabbed the victim from behind, dragged her across a driveway to an area covered with two large bushes, began to strangle her, and covered her mouth to keep her from screaming. When the victim attempted to escape, the

defendant threw her to the ground, forcibly removed her undergarments, and tried to penetrate her, without success. The Court of Appeals held that:

> [The defendant's] asportation of the victim . . . substantially increased the risk of harm to the victim by decreasing the possibility of detecting his criminal activity. Moreover, asportation to decrease the possibility of detection is not an act inherent in or necessary to the restraint required in the commission of attempted rape. His behavior substantially invaded the interests that § 18.2-47 [the abduction statute] was designed to protect.

*Id.* at 626, 352 S.E.2d at 534.

The Court of Appeals considered a similar situation in *Bell v. Commonwealth*, 22 Va. App. 93, 468 S.E.2d 114 (1996). As the two victims walked to their car from a friend's apartment, crossing a well-lit street, the defendant and another man approached them. The defendant placed a gun on top of the car and ordered the victims to empty their pockets and turn over their jewelry. After the victims complied, they attempted to return to the apartment, but the defendant pointed the gun at them and ordered them back. The assailants pulled the victims around to the side of the car and ordered them to lie face down on the sidewalk. The defendant patted down the female victim's thighs, inner legs and buttocks, unzipped her pants and sexually assaulted her. The Court of Appeals held that:

> [T]he jury could reasonably have found that the defendant's actions in pulling the female victim around the car and ordering her to lie down were acts of restraint and asportation separate and apart from the restraint inherent in either the sexual assault or the robbery. . . . Furthermore, the jury could reasonably have concluded that [the defendant] moved [the female victim] to avoid detection. . . . Moving [the female victim] . . . took her out of the line of sight from where she had come.

*Id.* at 98, 468 S.E.2d at 116.

Both parties cite for support the Court of Appeals' unpublished opinion in *Fishback v. Commonwealth*, 1999 WL 1129966 (Va. App. 1999). In *Fishback*, a cashier, who was working behind a store's register, was in the store with her husband and a customer, when the defendant ordered the husband and customer at gunpoint to lie on the floor. The defendant then walked to the counter, pointed his gun at the cashier, and demanded money;

the cashier gave the defendant the money from the cash register plus the bank bag under the counter. After taking the money, the defendant told the cashier as well to get on the floor and stay there for five minutes. The Court of Appeals held that:

> [T]he detention of the store's occupants . . . who were not victims of the robbery, while the appellant robbed [the cashier], was separate and apart from the restraint inherent in the act of robbery. Forcing [the husband and customer] onto the floor was greater than the kind of restraint needed to rob [the cashier]. After the robbery was completed and the money received from [the cashier], appellant forced her onto the floor *and demanded that she stay on the floor for five minutes*, actions not inherent in or necessary for completion of the crime of robbery.

*Id.* at 2.

Thus, in three cases applying the separate detention rule — *Coram, Bell,* and *Fishback, supra* — even a slight movement of a victim, beyond that necessary to commit the underlying crimes of robbery or sexual assault, was enough to show asportation and detention for abduction, beyond that force or detention proven for the underlying crimes.

In the instant case, the robbery of Holtz theoretically was complete when the Defendant obtained the money from the cash registers from her. No evidence was presented that the Defendant was aware that there was a safe in the back of the store. Given the presence of customers in the store, it is clear that the Defendant made the employees walk from the front to the back of the store to keep them from alerting the customers that a robbery was in progress. The Defendant's actions — in telling Williams to rip the telephone cord out of the wall and in telling Holtz to give him the security tape — are consistent with the Defendant's desire to prevent the employees from alerting the police or the customers about the robbery. Only when the Defendant and the employees got to the back office was the safe in plain view on the floor. As to the need for taking Williams to the back to complete the robbery, no reason existed to take Williams along to complete the robbery. Although the Defendant may not have known that Williams could not open the safe, he was aware that Williams could not open the cash registers. If only the manager, Holtz, could open the cash registers in the front of the store, where limited funds would be kept, Defendant certainly would have assumed that she would be the only person capable of opening the safe in the main office, with even more funds. Even had the Defendant known there was a safe in the back office

and gone to the back to get those funds from the safe, he only needed to take one employee — clearly Holtz — to open it; the Defendant had no reason to move Williams from the front of the store to the back, other than to attempt to avoid detection and to prevent him from alerting the police. The Court therefore finds that the movement of Williams from the front to the back of the store constituted abduction and would have even had the Defendant been charged with robbing Williams, as the movement and detention of Williams was not incidental to any robbery charge. As to Holtz, given the lack of evidence that Defendant knew about or was looking for a safe when he went to the back of the store, given his actions in leaving the two employees in the back of the store, further from the customers, taking the incriminating security tape, and ordering Williams to rip out the telephone, it is abundantly clear that Defendant carried out, after the robbery, further detention of Holtz beyond that necessary to complete the robbery of Holtz. This Court therefore also finds that the Defendant is guilty of use of a firearm in committing the abductions of Williams and Holtz.

### Identification of Defendant
### as Perpetrator of the Attack on Officer Williams

Officer Williams was unable to specifically identify the Defendant as the individual who shot at him, and thus the identification of the Defendant as the shooter is based on circumstantial evidence and the Defendant's statement to the police. Virginia law is clear that "circumstantial evidence "is as competent and is as entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypotheses except that of guilt." *Crawley v. Commonwealth*, 29 Va. App. 372, 375, 512 S.E.2d 169, 171 (1999) (quoting *Coleman v. Commonwealth*, 226 Va. 31, 53, 307 S.E.2d 864, 876 (1983), *cert. denied*, 465 U.S. 1109 (1984)). Circumstances of suspicion, no matter how grave or strong, are not proof of guilt sufficient to support a verdict of guilty. *Clodfelter v. Commonwealth*, 218 Va. 619, 623, 238 S.E.2d 820, 822 (1977).

In this case, the Blockbuster Video store employees immediately notified a security guard after the robbery, and the security guard contacted the police. The employees' detailed descriptions of the robber were that he was a black male, approximately 25 to 30 years old, 5'8" to 5'10" tall, dark complexioned, possibly having a mustache, wearing a gray shirt, long dark pants, blue and white tennis shoes, and a light blue baseball cap with the letters NC in white on the front of the cap, and was armed with a silver handgun. Officer Williams, who was in his marked police car in the same shopping center as the

Blockbuster Video store, one-quarter mile away, received that description by radio minutes after the robbery occurred — a black male, in a dark gray sweatshirt, light blue baseball cap — possibly a North Carolina Tarheel cap — dark-colored shorts and possibly on a bicycle. The officer immediately saw a black male on a bicycle approaching from the direction of the Blockbuster Video store; the bicyclist, who came within fifty yards of the officer, matched the description. Officer Williams therefore followed him onto Stanley Street, drove within ten to fifteen feet of him, and rolled down his window to get the bicyclist to stop. Instead, the suspect, seeing the officer, jumped off his bicycle, pulled out a chrome handgun, and with his arm fully extended, fired directly at the officer through the windshield of the marked police car. Officer Williams then saw the suspect hit the ground and a black videotape go into the air and fall to the ground. The suspect carried a Blockbuster bag on the bicycle handlebars.

In that very tight time frame, the proximity, and the match of the suspect to the description, it is clear that the Defendant, later identified by the Blockbuster employees as the robber, was the same person Officer Williams saw on the bicycle. The bicyclist/shooter matched the robber's gender, race, and clothing,[2] was in possession of a plastic Blockbuster bag and a chrome handgun, just like the robber; and was leaving the same shopping center parking lot as used by the Blockbuster store, traveling from the direction of the Blockbuster store, only moments after the robbery had occurred and the robber's description transmitted to Officer Williams. Officer Williams believed he had shot the shooting suspect when he returned his fire; the fact that the Defendant, at the time of his arrest the day after the robbery and shooting incident, had one visible gunshot wound to the back of his left ankle is further corroboration of the fact that the Defendant was not only the robber, but the shooter. In addition to all of the circumstantial evidence, the Defendant's statement to the police admits he robbed the video store employee, fled on a bicycle after the robbery, still in possession of a silver handgun, at which point he was involved in a shooting incident with a police officer. He also admits in that statement that he ran, that he dropped items — he left the robbery with a Blockbuster bag — and was wearing a blue hat, gray shirt, black pants, and blue sneakers. This Court finds the evidence, beyond a reasonable doubt, demonstrates that the Defendant was the individual who shot at Officer Williams.

---

[2] The only discrepancy was minor, whether the robber/shooter wore long dark pants or shorts.

*Specific Intent for Attempted Capital Murder*

To sustain a conviction for attempted capital murder, the evidence must establish "both a specific intent to kill the victim and an overt but ineffectual act committed in furtherance of the criminal purpose." *Martin v. Commonwealth*, 13 Va. App. 524, 527, 414 S.E.2d 401, 402 (1992) (quoting *Wynn v. Commonwealth*, 5 Va. App. 283, 292, 362 S.E.2d 193, 198 (1987)). The Court of Appeals addressed specific intent in *Bell v. Commonwealth*, 11 Va. App. 530, 533, 399 S.E.2d 450, 452 (1991) when it stated:

> [S]pecific intent may, like any other fact, be shown by circumstances. Intent is a state of mind which can be evidenced only by the words or conduct of the person who is claimed to have entertained it. The inferences to be drawn from proven facts, so long as they are reasonable, are within the province of the trier of fact. The fact finder may infer that a person intends the immediate, direct, and necessary consequences of his voluntary acts.

*Id.* (citations omitted).

The Commonwealth cites *Davis v. Commonwealth*, Record No. 1244-95-3 (Va. App. 1997), an unpublished opinion from the Court of Appeals, for support of the Commonwealth's contention that there was sufficient evidence for the Court to infer the Defendant's specific intent to kill. In *Davis*, the defendant had previously eluded arrest for murder by jumping from a second story window, saying that "he would resist any attempts to 'take him to jail'." Several weeks later, the police surrounded the defendant, who was sitting in a car with a loaded gun. The defendant defied the police's repeated orders to display his hands. Within a span of about ten seconds, the defendant sprang to his feet, pointed his gun at one of the officers, and scampered across the front seat to the open driver's side door. The officer immediately backed away when the defendant pointed the gun at him. The defendant emerged from the car, and instead of continuing his attempt to escape, he "looked at [the officer], pivoted in his direction and started bringing his gun towards him." He did not actually fire the weapon. The Court of Appeals held that the evidence was sufficient to prove that the defendant committed acts towards the commission of capital murder, stating that:

> [a]lthough appellant's prior actions and words during his escape . . . indicate only that his state of mind was to elude capture, his intent to kill could reasonably be inferred from the fact that he interrupted his

flight from the car to pivot towards [the officer]. [The officer] was only four feet away from appellant and presumably in position to tackle him unless appellant's escape from the car was swift. Instead of continuing his forward movements from the car door, appellant turned toward his left and started moving his gun towards [the officer]. In these circumstances, it was reasonable for the trial court to infer that appellant had formed the specific intent to fire his weapon and kill [the officer].

*Id.* at 1.

In the instant case, the Defendant, who had just robbed an employee at the Blockbuster Video store and was attempting to escape on a bicycle, was observed by an officer, in uniform and driving a marked police car, who then called out to him. Instead of continuing his escape on the bicycle, the Defendant stopped, jumped off his bicycle, reached down toward the waistband of his pants, spun toward Officer Williams' car, raised the gun, pointed it directly at the car with his arm fully extended, and fired. One shot entered the front windshield — above where the officer would have been sitting in the driver's seat, had the officer not leaned and dropped his upper body down toward the passenger seat — and lodged in the dashboard. Two additional shots were fired from outside the car, which lodged in the hood and in the top part of the vehicle's grill. The officer observed the Defendant walking toward the center of the vehicle's hood with the gun still in his hand and his arm still fully extended. Only when the officer fired several shots from the inside of the car did the Defendant run and jump on his bike before one of the officer's shots struck him, causing him to fall off the bicycle and hit the ground. As the Defendant got up on his hands and knees, trying to run away, the officer saw him switch his weapon from his right hand to his left.

The Defendant asserts that all his shots and actions were equally consistent with an attempt to escape, rather than harm the officer. However, the Defendant, when ordered to stop, did not continue riding the bicycle in order to escape from the police officer, but rather stopped, got off his bicycle, pulled out a weapon, aimed at the place where the police officer would have been sitting in the driver's seat, and fired his weapon three times; at least one bullet went through the windshield into the dashboard near where the officer had been sitting. The Defendant, had he merely been avoiding capture, could have shot at the car's tires in order to disable the vehicle and prevent the officer from chasing him. After Defendant fired the first shot, the officer was still slumped over toward the passenger side; at that point the Defendant could have continued to try to escape on the bicycle. Instead, he continued to walk

toward the police car, firing two more rounds toward the front of the car. Only after the officer returned fire did the Defendant run away, still holding the gun; there is no evidence that he would have stopped firing had the officer not returned fire. Only after the Defendant, being shot, fell off the bicycle, did he move his weapon from one hand to the other. The Court of Appeals in *Davis* upheld a conviction in similar circumstances, but where no shots were even fired. The evidence clearly supports convicting the Defendant of attempted malicious wounding of a police officer, as a lesser included offense of attempted capital murder,[3] because the facts support an inference that the Defendant, at a minimum, had the specific intent to maim, disfigure, or disable the officer. Here, however, as in *Davis*, the only reasonable inference to be drawn from the Defendant's actions is that he did not shoot to escape capture, but rather with the intent to kill the police officer. It is difficult to imagine a chain of events involving a firearm that would more clearly support such a finding. Therefore, this Court finds the Defendant guilty of attempted capital murder of a police officer, and use of a firearm in the commission of that attempted murder.

---

[3] Both sides agreed that attempted malicious wounding is a lesser included offense of attempted murder.