COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Beales, AtLee and Chaney
Argued at Norfolk, Virginia


DWAYNE LAMONT SAMPLE, JR.

MEMORANDUM OPINION[*] BY
v.      Record No. 0161-21-1                    JUDGE RANDOLPH A. BEALES
JUNE 28, 2022

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF NORTHAMPTON COUNTY
W. Revell Lewis III, Judge

Tucker L. Watson for appellant.

Sharon M. Carr, Assistant Attorney General (Mark R. Herring,[1]
Attorney General, on brief), for appellee.


Dwayne Lamont Sample, Jr., appeals an order of the Circuit Court of Northampton County

convicting him of attempted robbery.  On appeal, Sample challenges the trial court's denial of his

motion to suppress the out-of-court identification of him and the in-court identification of him made

by the victim of the attempted robbery.  He also argues that the evidence was insufficient to convict

him of attempted robbery.

## I.  BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the

light most favorable to the Commonwealth, [as] the prevailing party at trial."  *Gerald v.*

*Commonwealth*, 295 Va. 469, 472 (2018) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381

(2016)).  On September 17, 2019, around 10:00 p.m., Mark Angiulli ("Angiulli") was loading

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Jason S. Miyares succeeded Mark R. Herring as Attorney General on January 15, 2022.

granite onto a trailer with his son, Domenic Angiulli ("Domenic"), outside of the garage doors of a warehouse in Exmore in Northampton County when a man approached Angiulli and pointed a gun at him while Angiulli was sitting on a forklift seat about three or four feet off the ground. Angiulli testified at trial that the man said, "Give me your wallet!" and then added, "Give me your effing wallet!" Angiulli stated that the man then "kept coming toward me" and approached within two or three feet—and that the man turned the gun toward Angiulli's face in such a position that Angiulli could easily see the barrel of the gun. He noted that the warehouse had LED lights shining out of the garage doors. Angiulli then said that he recognized that the weapon was probably a BB gun, jumped at the man, and twisted it away from the man's grasp as both men hit the ground. During this confrontation and struggle, Angiulli testified that he was "face-to-face" with the perpetrator. He stated that the gun then flew out of their hands as they hit the ground, and the perpetrator then fled.

Angiulli and his son Domenic immediately called the police, and Domenic picked up the gun from the ground while they waited. Angiulli testified that Exmore Police Officer Jonathan Gonzalez arrived "about five or ten minutes after my 911 call." When Officer Gonzalez arrived, Angiulli immediately said, "I had some guy try to rob me with his BB gun." Officer Gonzalez talked to Angiulli and Domenic outside the garage, recording their conversation with his body camera. Angiulli and Domenic extended their arms and pointed in the direction in which the perpetrator ran away from the garage, and they described how he ran through a field and "ran past a white house" in that direction. Officer Gonzalez asked, "What was he wearing?" Angiulli replied that the assailant was wearing a "black hoodie, black jeans, and black and white tennis shoes. He was a skinny white kid about twenty years old, big brown eyes," "had a black ball cap," and "had a bandana" on his face. Angiulli described the bandana as either dark blue or black and white. Angiulli stated again that the perpetrator had "dark hair and brown eyes" and that he was not

wearing any gloves. He then repeated a third time that the man had "big brown eyes" and was about his height. Angiulli said that the man was about five feet ten inches tall with a thin build, weighing around 150 to 160 pounds. On the officer's body camera footage, Angiulli and Domenic can be seen pointing toward the area where they said that the assailant ran. Officer Gonzalez mentioned that he was familiar with several people who lived in the area toward which the perpetrator ran, including Sample, whose race he described as "mixed" and added that he "looks almost Hispanic."

Officer Gonzalez testified that, based upon Angiulli's description of the perpetrator and the direction in which the assailant ran, he thought Sample "pretty much fit the description that Mr. Angiulli had said." At that time, Sample weighed 162 pounds, was five feet nine inches in height, had brown eyes, and was twenty-one years old. Officer Gonzalez then retrieved a photo of Sample and returned within fifteen minutes to show the photo to Angiulli. As recorded on his body camera, Officer Gonzalez told Angiulli, "I have a picture of somebody that I was thinking about, but I don't know if, you said you just saw their eyes." He then showed Angiulli a photo of Sample on his phone, and Angiulli immediately said, "Yep." Officer Gonzalez then asked, "That's him?" Angiulli replied, "Yep." Officer Gonzalez then asked again, "You think that's definitely him?" Angiulli reiterated, "Yeah, those big brown eyes, yep." Angiulli then said that Sample was "light complected like that." Officer Gonzalez then asked, "kind of like pale-ish?" Angiulli replied, "Yeah."

Before trial, Sample moved to suppress Angiulli's out-of-court identification and to bar any in-court identification testimony. Sample argued that Officer Gonzalez created unduly suggestive circumstances by showing Angiulli only one photograph and stating that he suspected the person in the photograph of being the assailant. Sample contended that Angiulli's out-of-court identification was unreliable and that an in-court identification would lack an independent basis.

At the suppression hearing, Angiulli testified that when Sample stuck the gun in his face, he was concentrating on Sample's identity so that he could remember him and remember the gun. Angiulli described Sample's "dark, sunken eyes" and "dark eyebrows with distinct marks on them." Angiulli then identified Sample in court. When Angiulli identified Sample in court, the Commonwealth asked, "[W]hat's the basis for your identification?" Angiulli responded, "I will never forget those eyes directly above the barrel of the weapon." He also testified, "His eyes and his eyebrows is mostly what I saw. The bandana kind of came loose as we were struggling." Angiulli also described the path Sample took as he fled and, when shown a satellite image of the area, pointed out that path on the image. Angiulli also identified the gun that was used in the attempted robbery.

The trial court denied Sample's motion to suppress, emphasizing that Angiulli immediately and confidently identified Sample as the man who had attempted to rob him less than an hour before at that same location. The trial judge noted that Angiulli "also testified that he observed something about the assailant's eyes that were very distinctive." In addition, the trial court found that the garage door was open with "bright lights on inside." The trial court found, "[T]he assailant was facing the lights and facing the garage opening" and "did not have his back to the garage door when he came up and pointed the gun" at Angiulli demanding his wallet. All of these circumstances of the location and lighting were confirmed by video footage from Officer Gonzalez's body camera, which was admitted into evidence and was played for the trial judge to view. Consequently, the trial court ruled, "[B]ased on the totality of the circumstances, I do not think it's appropriate that the identification should be suppressed."

At Sample's trial, Dr. Lauren Thonensen of the Virginia Department of Forensic Science testified that she analyzed swabs of locations on the BB gun as well as buccal swabs taken from Sample, Angiulli, and Domenic. Dr. Thonensen eliminated Angiulli and Domenic as contributors

of the DNA on the "swab of the receiver of the BB gun" and found that Sample's DNA was located there on the gun. Dr. Thonensen eliminated Angiulli as a contributor to the DNA found on the trigger and the grip, but she could not make any further conclusions from that DNA sample. However, forensic molecular biologist Dr. Susan Greenspoon testified that she reviewed Dr. Thonensen's data and concluded that "there is strong statistical support for the association of Dwayne Sample" with DNA found on the trigger of the gun and the grip of the gun.[2]

At the conclusion of the bench trial, the trial court convicted Sample of attempted robbery. The trial court found that Angiulli's identification of Sample—in addition to the DNA found on the gun—showed that Sample committed the attempted robbery. Sample then appealed to this Court.

## II.  ANALYSIS

### A.  Angiulli's Identification of Sample

For his first assignment of error, Sample argues that "[t]he Trial Court erred in both denying Sample's motion to suppress the out-of-court identification and in allowing the in-court identification, because the out-of-court identification was unreliable and based on an unduly suggestive photo lineup and therefore tainted the in-court identification."

"In reviewing a trial court's denial of a motion to suppress," "we are bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them." *McGee v. Commonwealth*, 25 Va. App. 193, 197-98 (1997) (*en banc*) (citing *Ornelas v. United States*, 517 U.S. 690, 699 (1996)). "However, we review *de novo* the trial court's application of legal standards to the particular facts of the case." *Logan v. Commonwealth*, 51 Va. App. 111, 114-15 (2008) (citing *Ornelas*, 517 U.S. at 699).

---

[2] Specifically, Dr. Greenspoon testified that a match between the DNA mixture found on the gun's trigger and grip and Sample "is two trillion times more probable than a coincidental match to an unrelated African American person, thirty-nine billion times more probable than a coincidental match to a Caucasian person, and thirty-five billion times more probable than a coincidental match to an unrelated Hispanic person."

"The United States Supreme Court, in *Neil v. Biggers*, 409 U.S. 188 (1972), established a two-step test to determine the admissibility of an out-of-court identification." *Curtis v. Commonwealth*, 11 Va. App. 28, 31 (1990). The United States Supreme Court stated, "first, that due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary." *Perry v. New Hampshire*, 565 U.S. 228, 238-39 (2012) (citing *Biggers*, 409 U.S. at 198). Furthermore, "[e]ven when the police use such a procedure, the Court next said, suppression of the resulting identification is not the inevitable consequence." *Id.* at 239 (citing *Biggers*, 409 U.S. at 198-99). The Supreme Court then directs courts to consider whether "under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Biggers*, 409 U.S. at 199.

This Court has previously "found the use of a single photo display to be one of the most suggestive methods of identification and impermissibly suggestive *per se.*" *Curtis*, 11 Va. App. at 31. However, "[i]t is not enough that the procedure 'may have in some respects fallen short of the ideal,'" *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2559 (2018) (quoting *Simmons v. United States*, 390 U.S. 377, 385-86 (1968)), because "the primary evil to be avoided is 'a very substantial likelihood of irreparable misidentification,'" *Biggers*, 409 U.S. at 198 (quoting *Simmons*, 390 U.S. at 384). As the United States Supreme Court stated, "[i]t is the likelihood of misidentification which violates a defendant's right to due process." *Biggers*, 409 U.S. at 198. Consequently, "the Due Process Clause requires courts to assess, on a case-by-case basis, whether improper police conduct created a *substantial likelihood of misidentification*." *Sexton*, 138 S. Ct. at 2559 (emphasis added) (quoting *Perry*, 565 U.S. at 239). Thus, the United States Supreme Court has stated, "We therefore conclude that reliability is the linchpin in determining the admissibility of identification testimony." *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977). Furthermore, the Supreme Court of Virginia has stated, "Whether an identification is reliable

'depends on the totality of the circumstances.'" *Satcher v. Commonwealth*, 244 Va. 220, 250 (1992) (quoting *Stovall v. Denno*, 388 U.S. 293, 302 (1967)).

### 1.  The Five Factors from *Neil v. Biggers*

We turn, then, to "the central question" in the case before us according to the United States Supreme Court: "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Biggers*, 409 U.S. at 199. Contrary to the dissent's argument that the officer's showing of the photograph was so unduly suggestive that it destroyed the reliability of Angiulli's identification to the point where the second prong of *Neil v. Biggers* need not really be analyzed, the United States Supreme Court has made quite clear that an analysis under *Neil v. Biggers* is a two-part test—and that, even if there is an unduly suggestive photo identification procedure, that determination does not by any means end our analysis.  We must then move to the second part of the test, which determines whether the identification was still reliable based on the five factors that the United States Supreme Court directs us to employ in *Neil v. Biggers*.  As the Supreme Court explained, "The due process check for reliability, *Brathwaite* made plain, comes into play only after the defendant establishes improper police conduct.  The very purpose of the check, the Court noted, was to avoid depriving the jury of identification evidence that is reliable, *notwithstanding* improper police conduct." *Perry*, 565 U.S. at 241 (citing 432 U.S. at 112-13).

Therefore, in analyzing the second part of the test, the United States Supreme Court requires this Court to apply the following five factors in making a reliability determination.

> [T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Biggers*, 409 U.S. at 199-200.

i. Factor One: "The Opportunity of the Witness to View the Criminal at the Time of the Crime"

Sample came within "two to three feet" of Angiulli while standing in a well-lit area directly facing Angiulli. Although this attack took place at night, the trial court made a finding of fact that the area was well-lit because a viewing of Officer Gonzalez's body camera footage demonstrated that the area was bright enough to observe faces. As the trial court stated, "It is interesting to note that even though Mr. Angiulli and his son's backs were to the garage that was open, we could still see fairly clearly their faces." Officer Gonzalez's body camera footage does confirm that Angiulli's face and Domenic's face are quite visible although it is their backs that are turned toward the lights, and, therefore, an approaching person's face should also certainly be seen clearly in those LED lights.[3] In addition, Angiulli testified that, when he was "face-to-face" with Sample, "[h]is eyes and his eyebrows is mostly what I saw. The bandana kind of came loose as we were struggling." Angiulli also testified that he "will never forget those eyes directly above the barrel of the weapon." Accordingly, Angiulli had a clear opportunity to view Sample at the

---

[3] The dissenting opinion over and over again characterizes the facts in the light most favorable to appellant Sample in contravention of binding Supreme Court caselaw. Both the United States Supreme Court and the Virginia Supreme Court have repeatedly held that, "under well-settled principles of appellate review," appellate courts must "consider the evidence presented at trial in the light most favorable to the Commonwealth, [as] the prevailing party below." *Baldwin v. Commonwealth*, 274 Va. 276, 278 (2007); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This well-established standard of review requires us to "discard the evidence of the [appellant's] in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Gerald*, 295 Va. at 473. In addition, on appeal, "[t]he trial court's findings of fact are not disturbed unless plainly wrong or without evidence to support them." *Gregory v. Commonwealth*, 64 Va. App. 87, 93 (2014) (citing Code § 8.01-680). For example, the trial court found here that the garage door was open with "bright lights on inside," that "the assailant was facing the lights and facing the garage opening," and that he "did not have his back to the garage door when he came up and pointed the gun" at Angiulli demanding his wallet. Angiulli testified that "[t]he warehouse had LED lights shining out the door." Angiulli then stated that the perpetrator "came right up to me" and testified that they were "face-to-face" so that he could clearly see the perpetrator's eyes. LED lights from the warehouse, as recorded on Officer Gonzalez's body camera, cast a wide field of bright light outside of the warehouse. Angiulli testified about clearly seeing his assailant, including noting certain distinct characteristics about him, such as the assailant's eyes, height, weight, and age.

- 8 -

time the attempted robbery occurred. *See Satcher*, 244 Va. at 248-49 (finding that an identification was reliable where the victim "testified that she first saw the person who turned out to be her assailant when he was between 30 and 50 feet away from her on the bicycle path, that she looked at him 'a few times,' and that she made 'eye contact' with him when they passed one another, at which time they were 'very close,' not 'even . . . two feet' apart"); *see also Phan v. Commonwealth*, 258 Va. 506, 511 (1999).

ii. <u>Factor Two: "The Witness' Degree of Attention"</u>

Angiulli exhibited a high degree of attention to the details of his assailant's appearance and actions. Angiulli emphasized that he was concentrating on the perpetrator's identity and on the gun. He testified, "I kept looking back and forth and said, Remember him. Remember the gun. Remember him. Remember the gun." Furthermore, he consistently stated to Officer Gonzalez that the perpetrator had "big brown eyes." Officer Gonzalez's body camera video captured Angiulli giving a vivid description of his assailant and the attempted robbery right after it had occurred. Therefore, the record clearly demonstrates that Angiulli had given a high degree of attention to the perpetrator while the attempted robbery was occurring. *See Bryant v. Commonwealth*, 10 Va. App. 421, 426 (1990) (finding that the degree of attention factor weighed in the Commonwealth's favor because the witness testified that her "attention 'was riveted . . . on the person who was carrying her in his arms'").

iii. <u>Factor Three: "The Accuracy of the Witness' Prior Description of the Criminal"</u>

Angiulli gave a rather accurate description to Officer Gonzalez *before* the photograph was ever shown to him. As recorded on Officer Gonzalez's body camera video, Angiulli described Sample as being about five feet ten inches tall, 150 to 160 pounds, skinny, and about twenty years old, which substantially matched Sample's actual height of five feet nine inches tall, actual weight of 162 pounds, and actual age of twenty-one years. Even though Angiulli described Sample as

being white when he is of a mixed-race background, Angiulli otherwise provided Officer Gonzalez with a near-perfect description of Sample's height, age, weight, and eye color.[4]  *See McCary v. Commonwealth*, 228 Va. 219, 233 (1984); *see also Phan*, 258 Va. at 511 (holding that a victim's identification of a masked assailant was reliable when the victim displayed a high degree of attention to specific features of the assailant).  Furthermore, Angiulli repeated to Officer Gonzalez multiple times that the assailant had "big brown eyes," and at trial he testified, "I will never forget those eyes directly above the barrel of the weapon."  The photo in the record demonstrates that Sample did have big brown eyes as described by Angiulli.  Therefore, viewing the totality of his description of his assailant, Angiulli gave Officer Gonzalez a largely accurate description of Sample, particularly focusing on Sample's eyes, before a photograph of Sample was ever shown to him.

iv. Factor Four: "The Level of Certainty Demonstrated by the Witness"

Angiulli was absolutely certain of his identification of Sample as the person who tried to rob him, identifying him as the perpetrator immediately upon seeing the photo of Sample.  Officer Gonzalez then asked, "That's him?"  Angiulli replied, "Yep."  Officer Gonzalez pressed him further asking, "You think that's definitely him?"  Angiulli reiterated, "Yeah, those big brown eyes, yep."  Therefore, the record clearly demonstrates that Angiulli confidently stated *three* times to the officer

---

[4] Indeed, a significant portion of Angiulli's description of the perpetrator came *before* Officer Gonzalez ever even developed an idea of who might be the suspect.  As recorded on the body camera footage, Officer Gonzalez's initial question to Angiulli asking him to describe the assailant was "What was he wearing?"  Angiulli replied that the assailant was wearing a "black hoodie, black jeans, and black and white tennis shoes.  He was a skinny white kid about twenty years old, big brown eyes."  He also said that his assailant was about his own height.  While Angiulli mistakenly identified his assailant as white when he was actually of mixed race, Angiulli provided otherwise highly accurate details of his assailant, including his "big brown eyes," his age, and his height—all before Office Gonzalez (without naming anyone) said that he had developed an idea of who Angiulli was describing.

that the man in the photo was his assailant.[5] Angiulli was likewise very certain of his identification of Sample at trial as his assailant in the attempted robbery.

    v. <u>Factor Five: "The Length of Time Between the Crime and the Confrontation"</u>

Less than an hour had passed between the attempted robbery and Angiulli's identification of the man in the photograph as the man who had just pointed the gun at him and tried to rob him. On appeal, Sample concedes that the fourth factor and the fifth factor in the *Neil v. Biggers* reliability test both weigh in favor of concluding that Angiulli's identification of Sample was reliable in this case. At oral argument before this Court, Sample's counsel stated, "There's no doubt that Angiulli at trial expressed a degree of certainty, no doubt about that, factor number four. There's also no arguing that the length of time between the attempted robbery and the one photo identification was very brief relative to the other case law we see."[6]

Consequently, even if Officer Gonzalez's showing of the single photograph of Sample to Angiulli was "unnecessarily suggestive" under the first prong of *Neil v. Biggers*, the record demonstrates that *all* five of the factors under the second prong of the United States Supreme

---

[5] The dissent speculates, "After hearing the officer's suggestive remarks implicating Mr. Sample, viewing the suggestive single mugshot likely erased any independent recollection that the victim may have had from his inadequate opportunity to observe the perpetrator." However, the record simply does not reveal this to be true. On the contrary, when asked at the suppression hearing, "what's the basis of your identification?" Angiulli replied, "his eyes and his eyebrows is mostly what I saw" and emphasized, "I will never forget those eyes directly above the barrel of the weapon." This testimony is further confirmed by Angiulli's statement to Officer Gonzalez of "Yeah, those big brown eyes, yep" when he saw the photograph within an hour of the attempted robbery.

[6] Although the dissent weighs the fourth and fifth factors in *Neil v. Biggers* in favor of suppressing the identification, Sample's counsel, however, conceded both in his brief and at oral argument before this Court that these two factors are actually in the Commonwealth's favor— supporting the reliability of Angiulli's identification of Sample as his assailant. This Court appreciates the candor of Sample's counsel in conceding these two factors under *Neil v. Biggers* in his answers to the Court's questions during oral argument as "[s]uch candor by counsel embodies the ethical duties expected of a legal advocate and is held in high esteem." *Nimety v. Commonwealth*, 66 Va. App. 432, 436 n.3 (2016).

Court's *Neil v. Biggers* test support the trial court's decision to deny Sample's motion to suppress. *See Winston v. Commonwealth*, 268 Va. 564, 593 (2004) (establishing that *Neil v. Biggers* is a "two part analysis" in which "[t]he second part of the analysis is the determination of 'whether under the "totality of the circumstances" the identification was reliable even though the confrontation procedure was suggestive'"); *see also Perry*, 565 U.S. at 239 (holding that even if the police use a "suggestive and unnecessary" procedure, the "suppression of the resulting identification is not the inevitable consequence").[7] This Court is not required to find that all five factors in *Neil v. Biggers* must be present for an out-of-court identification to be admissible but instead must weigh the reliability of Anguilli's identification of Sample based on an analysis of all of those factors under the totality of the circumstances. *See Satcher*, 244 Va. at 250 (finding that, under *Neil v. Biggers* factor five, "the lapse of time alone is not sufficient to render an identification unreliable as a matter of law," but "[r]ather, whether an identification is reliable 'depends on the totality of the circumstances'" (quoting *Stovall*, 388 U.S. at 302)).

Here, the record demonstrates that there is overwhelming evidence, based on the totality of the circumstances under *all* five of the *Neil v. Biggers* factors, that Angiulli's out-of-court identification is reliable and should be admitted. Therefore, we certainly cannot say on appeal that the trial court erred in denying Sample's motion to suppress Angiulli's out-of-court identification of Sample. Furthermore, having determined that the out-of-court identification was admissible,

---

[7] The dissent concludes that "the officer's unduly suggestive identification procedure created a substantial likelihood of irreparable misidentification." However, the Supreme Court has made quite clear that an officer's suggestive photo identification procedure is not "[a] rule requiring automatic exclusion." *Perry*, 565 U.S. at 239. Instead, the United States Supreme Court has ruled that "when an 'identification is reliable despite an unnecessarily suggestive [police] identification procedure,' automatic exclusion 'is a Draconian sanction,' one 'that may frustrate rather than promote justice.'" *Id.* (quoting *Brathwaite*, 432 U.S. at 112). "[R]eliability is the linchpin in determining the admissibility of identification testimony." *Brathwaite*, 432 U.S. at 114. This Court is required to make a separate reliability determination under the five factors of the second prong of the test in *Neil v. Biggers* "*even though* the confrontation procedure was suggestive." *Winston*, 268 Va. at 593 (emphasis added).

- 12 -

we certainly also cannot say that the trial court erred in denying Sample's motion to suppress Angiulli's in-court testimony identifying Sample at trial as the man who attempted to rob him. *See Blevins v. Commonwealth*, 40 Va. App. 412, 426 (2003) (holding that when "the admission of the pre-trial identifications was not error, no basis exists for excluding the in-court identifications").

## B. Sufficiency of the Evidence

Sample argues in his second assignment of error that "[t]he Trial Court erred in denying Sample's motion to strike the charge because the evidence at trial was insufficient to support a finding of guilt beyond a reasonable doubt that Sample committed the offense of Virginia Code §[§] 18.2-58/18.2-26 ('Attempted Robbery')." Sample contends that Angiulli's identifications of him as the assailant were the result of a brief encounter and Officer Gonzalez's showing of the photograph of Sample to Angiulli. Sample further argues that the DNA demonstrated that there were "multiple contributors" to the DNA profiles developed from the BB gun, which "raises the question of other individuals possessing the gun, both prior to and during the robbery." Sample also hypothesizes that his DNA could have been on the gun because of "secondary transfer."

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Smith v. Commonwealth*, 296 Va. 450, 460 (2018) (alteration in original) (quoting *Commonwealth v. Perkins*, 295 Va. 323, 327 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Secret v. Commonwealth*, 296 Va. 204, 228 (2018) (alteration in original) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a

- 13 -

reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018) (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 288 (2017)).

Here, the trial court convicted Sample in part because of the finding that Sample's DNA "could not be excluded from" the DNA "found on the gun." Indeed, credible evidence supports the trial court's conclusion. The record reveals that Sample's DNA was found in *three* places on the gun. Dr. Thonensen's testimony and research show that Sample's DNA was on "the receiver of the BB gun." Dr. Greenspoon also testified, "[T]here is strong statistical support for the association of Dwayne Sample" to the trigger and the grip of the gun.[8] In addition, although Sample argues that his DNA could have been on the gun because of "secondary transfer," the trial court made a factual finding that "[t]here is no evidence before the court" to support that argument. The record in this case reveals no evidence whatsoever of how such a secondary transfer could have even occurred. *See Case v. Commonwealth*, 63 Va. App. 14, 23 (2014) ("[T]he Commonwealth need only exclude reasonable hypotheses of innocence that flow from the evidence, not those that spring from the imagination of the defendant." (quoting *Emerson v. Commonwealth*, 43 Va. App. 263, 277 (2004))).

In addition, the Commonwealth's evidence demonstrated that, in a lighted area and within "two to three feet" of Angiulli, Sample pointed the gun at Angiulli while at the same time demanding Angiulli's wallet. Angiulli stated that he got a clear view of Sample's "big brown

---

[8] As noted *supra*, Dr. Greenspoon concluded that a match between the DNA mixture found on the gun's trigger and grip and Sample "is two trillion times more probable than a coincidental match to an unrelated African American person, thirty-nine billion times more probable than a coincidental match to a Caucasian person, and thirty-five billion times more probable than a coincidental match to an unrelated Hispanic person."

eyes" "directly above the barrel" of the gun. Angiulli knocked the gun from Sample's hand during a struggle that partially dislodged the bandana covering Sample's face, and Sample then fled. Thus, the evidence demonstrated that Angiulli had a good opportunity to view Sample and exhibited a high degree of attention to Sample's appearance and actions. *See Blevins*, 40 Va. App. at 425 (stating that the witness "had ample opportunity to view the" perpetrator, testifying "that the parking garage was 'bright' and 'well lit' and that he had a 'real good' 'unobstructed view' of the assailant from a distance of ten to fifteen feet for four to five seconds"); *see also Phan*, 258 Va. at 511 (holding that a victim's identification of a masked assailant was reliable when the victim displayed a high degree of attention to specific features of the assailant).

Furthermore, Angiulli largely accurately described a number of Sample's physical characteristics before Officer Gonzalez ever drew attention to Sample in any way. Angiulli's description was accurate to within an inch of Sample's actual height, within several pounds of Sample's actual weight, and within a year of Sample's actual age, and Officer Gonzalez testified that he almost immediately thought of Sample because he "pretty much fit" Angiulli's description. Angiulli and Domenic also described the direction in which the assailant fled, and Officer Gonzalez knew Sample was living in that area toward which the perpetrator fled. Angiulli immediately recognized Sample when Officer Gonzalez showed a photo to Angiulli less than an hour after the attempted robbery and confirmed his identification of Sample as the perpetrator when Officer Gonzalez asked if he was sure. Angiulli identified Sample in the photograph by recognizing "those big brown eyes"—a feature he had repeatedly mentioned to Officer Gonzalez. In addition, having not seen the photograph since the date of the attempted robbery, and without expressing any uncertainty, Angiulli also identified Sample in court based on "his eyes and eyebrows."

Both Angiulli's out-of-court identification of Sample and his in-court identification of Sample were corroborated by the fact that (1) Sample's DNA was located not merely on the gun

but specifically on its trigger, and (2) the assailant fled in the very direction toward which Sample was then living. Therefore, the Commonwealth's evidence was such that we certainly cannot say that no rational factfinder could find the evidence sufficient to identify Sample as the perpetrator of the attempted robbery.

## III. CONCLUSION

In short, Angiulli's out-of-court identification of Sample as the assailant who attempted to rob him satisfies *all* five of the factors determining reliability that are enumerated by the United States Supreme Court in *Neil v. Biggers.* Angiulli had the opportunity to view Sample and explained clearly how he displayed a high degree of attention during the time of the attempted robbery. Although the perpetrator was wearing a bandana as a mask across his mouth, nose, and lower face, Angiulli could see his eyes and eyebrows and gave the police a very good description of Sample down to his height, weight, age, and eye color before ever being shown a photo of Sample. While Angiulli incorrectly said that he thought the perpetrator was white, Sample is of mixed race (although described by Officer Gonzalez as "pale-ish"). Perhaps, most importantly, Angiulli stated three times that he was certain Sample was his assailant when he viewed a photo of him within less than an hour of the attempted robbery. Viewing the totality of the circumstances, as the Supreme Court has made clear that we must, it is quite clear that all five of the factors enunciated by the Supreme Court in *Neil v. Biggers* for determining reliability of an identification were met in Angiulli's out-of-court identification in this case. Therefore, we certainly cannot say on appeal that the trial court erred in denying Sample's motion to suppress Angiulli's out-of-court identification of Sample. As a result, the trial court certainly also did not err in allowing Angiulli to identify Sample in court at trial as the man who attempted to rob him.

Furthermore, this Court clearly cannot say that no rational factfinder could find Sample guilty of attempted robbery. Sample's DNA was found in *three* places on the BB gun. Angiulli

- 16 -

also provided a vivid description not only of the attempted robbery but also of the perpetrator—both right after the crime occurred and later in court at the trial.

Therefore, for all of these reasons, we uphold the trial court's conviction of Sample for attempted robbery.

*Affirmed.*

Chaney, J., dissenting.

The victim of an attempted robbery identified Mr. Sample as the perpetrator after a police officer improperly arranged an unnecessarily suggestive out-of-court identification procedure. Because the improper identification procedure created a very substantial likelihood of irreparable misidentification, the admission into evidence of the victim's identification of Mr. Sample violated his constitutional right to due process. Therefore, I respectfully dissent from the majority's decision upholding the denial of Mr. Sample's motion to exclude the tainted identification evidence and affirming his conviction for attempted robbery.

## I. THE VICTIM'S OUT-OF-COURT DESCRIPTION OF THE PERPETRATOR

Around 10:00 p.m. on September 17, 2019, Mark Angiulli ("the victim") and his adult son were outside a warehouse using a forklift when someone pointed a gun at the victim and demanded his wallet.[9] According to the victim, it was dark outside the warehouse and there were no streetlights. As the perpetrator moved closer, the victim recognized that the gun was a BB gun. The victim shouted to his son, "It's a fucking BB gun!" and jumped off the forklift, grabbed the front end of the gun, toppled to the ground, and twisted the gun away from the perpetrator, who immediately ran away.

A few minutes after the attempted robbery, Officer Jonathan Gonzalez ("the officer") of the Exmore Police Department interviewed the victim and his son outside the warehouse. The victim stated that while he and his son were loading a piece of granite onto a trailer, he suddenly noticed the perpetrator standing next to him, pointing a gun. According to the victim, "He came

---

[9] This dissent considers the facts in the light most favorable to the Commonwealth, notwithstanding the majority's contention that "[t]he dissenting opinion over and over again characterizes the facts in the light most favorable to appellant Sample." In reviewing the facts in the light most favorable to the party that prevailed below, this Court cannot ignore uncontradicted evidence that may be favorable to the appellant. *See Cheatham v. Gregory*, 227 Va. 1, 4-5 (1984).

out of nowhere." The victim's son similarly stated, "I turned around and there's a gun pointed at my dad. I didn't even see him come up."

The victim reported that the perpetrator was wearing a black hoodie over a ball cap, black or dark blue jeans, and black and white shoes. He also reported that the perpetrator's face was covered by a bandana that was either black or dark blue. However, after the victim's son confidently described the bandana's colors as black and white, the victim promptly changed his description by adding the color white to his description of the perpetrator's bandana. Both the victim and his son reported that the perpetrator was not wearing gloves.

When the officer asked for a description of the perpetrator, the victim and his son both replied that the perpetrator was wearing a bandana over his face. The victim described the perpetrator as a "skinny white kid," about five feet and ten inches in height, approximately 150 to 160 pounds, about twenty years old, with dark hair and big brown eyes. During his brief police interview, the victim repeatedly mentioned one prominent feature of the perpetrator—that he was "white."

## II. THE SUGGESTIVE IDENTIFICATION PROCEDURE

While the officer was taking the victim's report, the victim wondered aloud whether the perpetrator lived in one of the nearby residences. In response, the officer stated, "There's a guy that lives up there. He's like mixed, so he looks almost Hispanic. He's not a white guy, but he's a skinny build." The victim replied, "He didn't look mixed to me, you know, he looked white to me."

The officer informed the victim that he would investigate the area for someone matching the victim's description of the perpetrator. Within thirty minutes, the officer returned and told the victim, "I have a pretty good idea of who it may be because of the direction he ran." The officer stated, "I have a picture of somebody that I was thinking about but I don't know if—you

said you just saw their eyes." The officer then showed the victim a mugshot of Mr. Sample on his cell phone. The victim looked at the photo and immediately said, "Yep." The officer inquired, "That's him?" The victim repeated, "Yep." The officer replied, "Okay. Alright."

After showing Mr. Sample's mugshot to the victim, the officer asked, "What color was the bandana?" The victim again stated that the bandana was dark blue and white or black and white. The officer then enlarged the mugshot on his cell phone and asked, "You think that's definitely him?" The victim replied, "Yeah—those big brown eyes."

After viewing the single mugshot and confirming the officer's hunch about the identity of the perpetrator, the victim asked the officer, "You think he done that before?" The officer replied, "He's done some other stuff." The victim concluded, "Yeah. He probably wanted some heroin money."

Although the victim and his son both originally reported that the perpetrator's face was covered by a bandana throughout their brief encounter, the victim testified at the suppression hearing that the bandana "kind of came loose as [they] were struggling. It came down real quick, and like a flash [the perpetrator] was gone, but I will never forget those eyes directly above the barrel of the weapon."

### III. ANALYSIS

The Supreme Court has recognized that the Due Process Clause of the Fourteenth Amendment is implicated when law enforcement officers use an identification procedure that is unnecessarily suggestive. *See Perry v. New Hampshire*, 565 U.S. 228, 238-39 (2012); s*ee also Walker v. Commonwealth*, 74 Va. App. 475, 500 (2022) ("[S]uggestive identification procedures in the investigation of crimes can so taint the identification as to raise due process concerns regarding admitting the identification at trial."). An identification procedure using a photo of a single suspect "is one of the most suggestive and hence most objectionable methods of

identification." *Bloodworth v. Hopper*, 539 F.2d 1382, 1383 (5th Cir. 1976) (citing *Simmons v. United States*, 390 U.S. 377, 383 (1968)); s*ee also Simmons*, 390 U.S. at 383 ("This danger [of misidentification] will be increased if the police display to the witness only the picture of a single individual . . . ."); *Wise v. Commonwealth*, 6 Va. App. 178, 184 (1988) ("[A] single photograph display is one of the most suggestive methods of identification and is *always to be viewed with suspicion*." (emphasis added) (quoting *Hudson v. Blackburn*, 601 F.2d 785, 788 (5th Cir. 1979))); *Wise*, 6 Va. App. at 184 ("[S]ignificant problems are inherent in the use of a single-photograph identification procedure.").

The trial court's finding that the officer's single mugshot identification procedure was not unduly suggestive is plainly wrong. In addition to the inherently suggestive nature of a single photo identification procedure, the use of a mugshot is suggestive of criminality, and is likely to influence a witness's perception of the person depicted in the photo. The single mugshot identification procedure was unnecessary because there was no emergency or exigent circumstance preventing the officer from arranging a photographic array or conducting a lineup to allow the victim to select the perpetrator as opposed to confirming the officer's selection of Mr. Sample. Additionally, the evidence demonstrates that the victim's perception was unduly influenced by the pre-identification process, including the officer's suggestive statements that (i) he suspected a non-white man, (ii) who lived nearby, (iii) whose age, height, and build matched the victim's description of the perpetrator, and (iv) he "ha[d] a pretty good idea" that the man in the mugshot was the perpetrator.

After the victim confirmed the officer's selection of Mr. Sample, the officer made additional suggestive remarks that reinforced the victim's identification. After viewing Mr. Sample's mugshot, the victim asked the officer, "You think he done that before?" When the

officer replied, "He's done some other stuff," the victim inferred, "Yeah. He probably wanted some heroin money."

If the suggestive identification procedure created a substantial likelihood of misidentification, then the officer's use of the procedure violated Mr. Sample's right to due process, and testimony concerning the victim's out-of-court identification was inadmissible. *Neil v. Biggers*, 409 U.S. 188, 198 (1972). Furthermore, if the suggestive identification procedure created a substantial likelihood of *irreparable* misidentification, then the victim's in-court identification of Mr. Sample was inadmissible, and its admission violated his right to due process. *Id.*

To determine whether the officer's use of an unnecessarily suggestive identification procedure created a substantial likelihood of misidentification, we must balance the indicia of the identification's reliability against the corrupting influence of the suggestive identification procedure.[10] As the majority notes, the Supreme Court has identified five factors to be considered in determining "whether under the 'totality of the circumstances' the identification was reliable." *Biggers*, 409 U.S. at 201. The five "*Biggers* factors" to be considered in evaluating the reliability of a witness's identification are: (i) the opportunity of the witness to view the criminal at the time of the crime; (ii) the witness's degree of attention; (iii) the accuracy of the witness's prior description of the criminal; (iv) the level of certainty demonstrated by the witness at the confrontation; and (v) the length of time between the crime and the confrontation. *Id.* at 199-200. "Against these factors is to be weighed the corrupting effect of the suggestive identification itself." *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).

---

[10] This dissent includes a thorough analysis of the application of the five "*Biggers* factors*" for assessing the reliability of the victim's identification of Mr. Sample, notwithstanding the majority's contention that the dissent argues that these factors "need not really be analyzed."

- 22 -

Applying the *Biggers* factors to the facts of this case, this Court should defer to the trial court's factual findings if they are supported by the evidence and review *de novo* the application of law to those facts.[11] *See Ray v. Commonwealth*, 74 Va. App. 291, 302 (2022). Weighing the *Biggers* factors against the corrupting influence of the officer's suggestive identification procedure, I conclude that the officer's unduly suggestive identification procedure created a substantial likelihood of irreparable misidentification. *See Brathwaite*, 432 U.S. at 114.

    i. <u>The Victim's Opportunity to View the Perpetrator at the Time of the Crime</u>

The trial court found that the victim's encounter with the perpetrator lasted only "a matter of seconds." According to both witnesses' original reports about this brief encounter, they had no opportunity to view most of the perpetrator's face because a bandana covered it. Additionally, the perpetrator was also wearing a black ball cap and a black hoodie over his head.

At the suppression hearing, the victim changed his account regarding the perpetrator's bandana, testifying that it "came down real quick" when they fell to the ground as they struggled over the gun.[12] Then the perpetrator got up and was gone "like a flash." Even when crediting the victim's later testimony over his original report about the perpetrator's bandana, the victim had only a fleeting opportunity to view the perpetrator's face in the dark of night. Moreover, the victim did not testify that he noticed any of the perpetrator's facial features when the bandana quickly slipped down.

The trial court found that "the assailant was facing the lights and facing the garage opening when—and did not have his back to the garage door when he came up and pointed the

---

[11] The application and analysis of each of the *Biggers* factors is a matter of law which is not properly decided by a party's concession. *See Cofield v. Nuckles*, 239 Va. 186, 194 (1990) ("A party can concede the facts but cannot concede the law.").

[12] As the parties agreed, the transcript of the victim's testimony at the suppression hearing was admitted in evidence at trial in lieu of additional testimony by the victim.

gun . . . ." These factual findings are not supported by the evidence. The victim testified that the perpetrator "appeared from [the victim's] left" and was initially standing where "the street was black, and the streetlight was out, and he was standing in the shadows of the [pickup] truck and the trailer." Then the perpetrator "approached from the side" of the victim. According to the victim's son's testimony, apart from the light near the warehouse opening, "[i]t was dark everywhere else. There was really no streetlights." The victim's son admitted that he was unable to get a good look at the perpetrator, and he could not identify him. These eyewitness accounts support neither the trial court's findings about the light on the perpetrator's face nor the majority's conclusion that it was "a well-lit area."

Additionally, the trial court's findings about the lighting conditions were based on the visibility of the witnesses' faces on the officer's bodycam video. As the majority notes, the witnesses' faces can be seen on the bodycam video when the witnesses were standing outside and facing away from the bright light emanating from the warehouse opening. However, the officer's bodycam recorded the lighting conditions at a later time, and it is speculative to infer that the interior warehouse lighting was the same on the bodycam video as it was at the time of the crime. Under these circumstances, it is unreasonable to infer that the officer's bodycam video provided a more accurate depiction of the lighting conditions at the time of the crime than was provided by the eyewitnesses, who both testified under oath about their personal knowledge of the poor lighting conditions. Additionally, the bodycam video shows that there is a light source emanating from the officer when he interviewed the witnesses, in addition to the light from the flashlight that the officer was holding.[13] Moreover, regardless of the lighting conditions, the perpetrator's face was covered by a bandana the entire time, except for a fleeting moment when he and the victim fell to the ground.

---

[13] The officer's bodycam video also appears to be night vision footage.

## ii. The Victim's Degree of Attention

Before their encounter with the perpetrator, the victim and his son were focused on operating a forklift and loading a piece of granite onto a trailer. As they reported to the officer, they were paying attention to their work when they suddenly noticed the perpetrator standing next to the victim and pointing a gun. According to the victim, "He came out of nowhere." The victim's son similarly stated, "I turned around and there's a gun pointed at my dad. I didn't even see him come up." Subsequently, during much of the seconds-long encounter, the victim was admittedly focused on the gun, detracting from his attention on the perpetrator.

## iii. The Accuracy of the Victim's Prior Description of the Criminal

The victim originally described the perpetrator as a "white guy" and "white kid." Moreover, the victim originally insisted that the perpetrator was white and "not mixed." Additionally, the victim originally reported that the perpetrator was dressed in black and wearing a black or dark blue bandana.

The victim demonstrated his susceptibility to suggestion when, in the presence of the officer, he changed his description of the bandana's color to add the color white when he heard his son confidently tell the officer that the bandana was black and white. More significantly, although the victim was originally insistent that the perpetrator was white, he identified Mr. Sample—a non-white person—after the officer impermissibly suggested that he, the officer, suspected a "mixed," "almost Hispanic-looking" man who lived in a nearby residence. As the officer originally described Mr. Sample to the victim: "He's not white." Clearly, the victim did not provide an accurate description of Mr. Sample when he described the perpetrator prior to the suggestive identification procedure.

- 25 -

iv.  The Level of Certainty Demonstrated by the Victim at the Confrontation

Before the officer showed the victim Mr. Sample's mugshot, the officer told the victim, "I have a pretty good idea of who it may be because of the direction he ran." The officer stated, "I have a picture of somebody that I was thinking about but I don't know if—you said you just saw their eyes." The officer then showed the victim a mugshot of Mr. Sample on his cell phone. The victim looked at the photo and immediately said, "Yep." The officer inquired, "That's him?" The victim repeated, "Yep." The officer replied, "Okay. Alright." The officer subsequently enlarged the mugshot on his cell phone and asked, "You think that's definitely him?" The victim replied, "Yeah—those big brown eyes."

v.  The Length of Time Between the Crime and the Confrontation

The victim reported the attempted robbery to the officer within a few minutes of the crime. After taking the victim's report, the officer left to investigate and returned within thirty minutes to further question the victim. At this time, the officer showed the victim Mr. Sample's mugshot. It appears, therefore, that the length of time between the crime and "the confrontation" with the mugshot was less than an hour.

Under the totality of the circumstances, there was a very substantial likelihood of misidentification of Mr. Sample. The totality of evidence related to the *Biggers* factors does not support a finding that the victim's pretrial identification of Mr. Sample was reliable notwithstanding the highly suggestive identification procedure. First, the victim had an inadequate opportunity to observe the bandana-wearing perpetrator during the seconds-long encounter under poor lighting conditions. Second, the victim's concentrated focus on the gun detracted from his attention on the perpetrator. Third, the victim's original description of the perpetrator as a "white guy" and "white kid" was not an accurate description of Mr. Sample. As the officer acknowledged, "He is not white."

Although the victim expressed confidence that the man in the single mugshot was the perpetrator and although the victim expressed this confidence within an hour of the crime, this confidence was itself infected by the suggestive identification procedure. *See Raheem v. Kelly*, 257 F.3d 122, 135 (2d Cir. 2001) ("[D]ue process precludes the generation of [a witness's] increased certainty through a suggestive lineup." (citing *Simmons*, 390 U.S. at 383)). The officer presented Mr. Sample's mugshot to the victim after observing that the victim's description of the perpetrator was susceptible to suggestion. The officer decided to use a single mugshot identification procedure despite the victim's report that he did not see the perpetrator's face, but for his eyes. The officer's suggestive remarks aggravated the inherent suggestiveness of the single mugshot identification procedure. The officer tainted the victim's identification of the man in the mugshot by (1) informing the victim that the officer had "a pretty good idea" that he was the perpetrator; s*ee Simmons*, 390 U.S. at 383 ("The chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime."); (2) informing the victim that the single suspect resided nearby—after the victim wondered aloud whether the perpetrator resided nearby; (3) informing the victim that the height and build of the single suspect approximated the victim's description of the perpetrator's height and build; (4) informing the victim that the single suspect had a criminal record; and (5) showing the single suspect's entire face rather than showing the face from the eyes up. *See Brathwaite*, 432 U.S. at 112 ("Usually the witness must testify about an encounter with a total stranger under circumstances of emergency or emotional stress. The witness' recollection of the stranger can be distorted easily by the circumstances or by later actions of the police."). Upon consideration of the totality of the circumstances, any indicators of the victim's ability to reliably identify the perpetrator are outweighed by the corrupting effect of the suggestive identification procedure.

Under the totality of circumstances, there was also a very substantial likelihood of *irreparable* misidentification of Mr. Sample, requiring exclusion of the victim's in-court identification.[14]  *See Biggers*, 409 U.S. at 198.  The impermissibly suggestive out-of-court identification procedure tainted the victim's ability to make a reliable in-court identification.  After hearing the officer's suggestive remarks implicating Mr. Sample, viewing the suggestive single mugshot likely erased any independent recollection that the victim may have had from his inadequate opportunity to observe the perpetrator.  *See Simmons*, 390 U.S. at 383-84 ("[T]he witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification.").  The victim's in-court identification of Mr. Sample should have been excluded because the evidence does not support a finding that the victim's in-court identification had any "origin independent of the inadmissible out-of-court identification."  *Wise*, 6 Va. App. at 186 (citing *Hill v. Commonwealth*, 2 Va. App. 683, 693 (1986)).  Therefore, the trial court erred in denying the defense motion to exclude the victim's out-of-court and in-court identifications of Mr. Sample.

## IV.  Not Harmless Error

The improper admission of the tainted and unreliable identification evidence violated Mr. Sample's constitutional right to due process.  To be harmless, this constitutional error must be harmless beyond a reasonable doubt.  *See id.* at 187 (citing *Chapman v. California*, 386 U.S. 18, 23-24 (1967)).  The proper inquiry for determining whether constitutional error was harmless is "whether the [factfinder] *would have* returned the same verdict absent the error." *Commonwealth v. White*, 293 Va. 411, 421-22 (2017) (alteration in original) (quoting

---

[14] "[O]ther evidence of a defendant's guilt, not dealing with the individual eyewitness's personal observation and memory, plays no part in the analysis of the reliability of that eyewitness's identification."  *Wise*, 6 Va. App. at 185-86 (citing *Brathwaite*, 432 U.S. at 116).

*Washington v. Recuenco*, 548 U.S. 212, 221 (2006)).  On this record, it is not clear beyond a reasonable doubt that the factfinder would have convicted Mr. Sample absent the constitutional error.  Therefore, the trial court's error in admitting the tainted, unreliable identification evidence was not harmless error.

## V. CONCLUSION

The trial court erred in denying Mr. Sample's motion to suppress the identification evidence that was tainted by the unnecessarily suggestive identification procedure.  The single mugshot identification procedure coupled with the officer's suggestive remarks created a very substantial likelihood of irreparable misidentification of Mr. Sample.  The admission of the victim's identification of Mr. Sample was a violation of Mr. Sample's constitutional right to due process and was not harmless error.

Therefore, I respectfully dissent from the majority's decision upholding the trial court's denial of Mr. Sample's suppression motion and affirming his conviction.  I would reverse the trial court's ruling, vacate the conviction, and remand for retrial if the Commonwealth be so advised.